Rodney Alton BAILEY, Appellant,

v.

Deborah Ann BAILEY, Appellee.

No. 07–98–0047–CV.

Court of Appeals of Texas,
Amarillo.

Feb. 25, 1999.

Underwood, Wilson, Berry, Stein & Johnson, P.C., Christopher K. Wrampelmeier, Amarillo, for appellant.

Law Offices of George Harwood, George Harwood, Amarillo, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

BRIAN QUINN, Justice.

This appeal touches upon the matter of child support and the extent of a trial court's authority to dictate its manner of disbursement. Through four issues, Rodney Alton Bailey (Rodney) posits that the trial court abused its discretion in: 1) segregating a portion of the support into an account and specifying how the monies were to be expended; 2) requiring both parents to jointly determine how the sum would be spent; 3) retaining authority to disburse the sum if the parents could not jointly agree as to its disbursement; and 4) awarding to the child the funds remaining in the account once the obligation to support ends. We affirm.

### Background

Rodney married Deborah A. Bailey (Deborah). Their union begat two sons, Christopher and Jeffrey. Yet, time proved detrimental to the marriage, for as it passed, so too did the spouses' desire to remain together. Eventually, the couple divorced and the court appointed Deborah the managing conservator of both children. Years later, Rodney moved the court to alter the conservatorship arrangement. Specifically, he sought appointment as the sole managing conservator of Jeffrey.

A hearing was apparently held on the motion, but the evidence proffered at such time is unknown to us, for we have no reporter's record. Nevertheless, the parties tendered to us an "Agreed Statement of the Case." According to that document and the appellate record, the court did not designate Rodney as Jeffrey's managing conservator. Rather, via a document entitled "Order on

Motion to Modify in Suit Affecting the Parent–Child Relationship," it bestowed on both parents the status of joint managing conservators. Furthermore, Deborah was granted the right to establish the primary residence of Christopher, receive child support from Rodney, "and to hold or disburse [the support] for the benefit of" the minor. In turn, Rodney was permitted to establish the primary residence of Jeffrey, receive support from Deborah, and "to hold or disburse [the support] for the benefit of" Jeffrey.

In the very same order, the court also set the amount of child support payable by each parent. Rodney was directed to pay Deborah $660 per month. Yet, Deborah was not ordered to directly pay Rodney anything. Instead, the court directed her to deliver $400 per month to the court clerk. Then, it entered the following directive:

1. The Clerk shall pay $300 to Rodney ... for the support of the child Jeffrey; and

2. The Clerk shall deposit the remaining $100.00 into a joint checking account.... Such monies are to be used for the general health, maintenance, education and welfare of the child Jeffrey.... If the parties cannot agree as to the disposition of such funds, then either party may petition the Court for an order authorizing distribution. All sums remaining in said account, at the time the obligation to pay support ceases, shall be delivered to and become the property of Jeffrey....

It is this portion of the order about which Rodney complains and with regard to which he asserts his four issues on appeal.

### Discussion

Before addressing each point asserted, we find it beneficial to discuss the purpose of child support. Long ago, the jurisprudence of this state recognized that a parent had a "natural and moral obligation" to provide for or support his offspring.

*Lane v. Phillips,* 69 Tex. 240, 243, 6 S.W. 610, 611 (1887). Initially, the duty fell primarily upon the father. *Gomez v. Perez,* 409 U.S. 535, 536, 93 S.Ct. 872, 874, 35 L.Ed.2d 56, 58–59 (1973). Now, it is indisputable that both parents must shoulder the task. *R.W. v. Texas Dept. of Protective & Reg. Servs.,* 944 S.W.2d 437, 440 n. 4 (Tex. App.—Houston [14th Dist.] 1997, no writ); *In re R.D.S.,* 902 S.W.2d 714, 719 (Tex. App.—Amarillo 1995, no writ). In other words, the obligation to support is joint.[1] And, it remains joint even though the child's parents divorce. Indeed, entrusting the child to an ex-spouse does not relieve the parent of his or her responsibility to assure that the child is properly cared for, unless the ex-spouse has the *sole and exclusive* care, custody, and control over the minor. *Harrington v. State,* 547 S.W.2d 621, 624 (Tex.Crim.App.1977).

Thus, a mother is not entitled to ignore the needs of her child simply because the father provides a monthly support payment. Nor does the payment relieve the father from seeing that the child is otherwise receiving proper care. For example, if the child involved were an infant and his mother (the managing conservator) had become mentally or physically incapable of caring for it, could it rationally be said that the father may allow the child to waste away simply because he sends a monthly check? Or, if the father knew that his ex-wife were physically abusing the infant, is the father legally justified in ignoring the circumstance solely because he pays his obligatory support? Under each circumstance, the answer is obviously no. This is so because both parents owe a continuing duty to the child. *Harrington v. State, supra.* In short, the provision of financial support satisfies only one aspect of the parents' duty. It merely creates a pool of funds from which the economic needs of the child can be redressed. The other aspect concerns assurance that the needs are actually being redressed, and both parents must fulfill these needs as long as they have some

---

**1.** By this, we are not saying that each parent has to pay the same amount of child support. Payment of support is not what we are discussing here. Instead, our attention is focused upon the concept of support rather than how that concept is enforced via payment of money or the provision of goods.

right to the care, custody, and control of the youth.

■ Next, the scope of the duty to support was, and is, quite plenary. As alluded to above, it encompasses the rather boundless task of maintaining and educating, *see, e.g., Cook v. Mann,* 40 S.W.2d 72, 74 (Tex. Comm'n App.1931), which at a minimum obligates the parents to provide the child those things necessary in sickness and health, *Mitchell v. Davis,* 205 S.W.2d 812, 814 (Tex. Civ.App.—Dallas 1947, writ ref'd), such as clothing, food, shelter, medical and dental attention, and education. TEX. FAM.CODE ANN. § 151.003(a)(3) (Vernon 1996); *see Cooper v. Cooper,* 513 S.W.2d 229, 234 (Tex.Civ. App.—Houston [1st Dist.] 1974, no writ) (noting that the duty to support may encompass more than the mere provision of necessaries).

■ Finally, decisions regarding child support and its payment lie within the trial court's considerable discretion. Such discretion is not abused so long as the decision comports with guiding rules and principles. *In re Striegler,* 915 S.W.2d 629, 637 (Tex. App.—Amarillo 1996, writ denied).

### Issue One

■ Did the trial court err in expressly ordering that $100 of the $400 payable by Deborah be used for a specific purpose? That is the first question asked of us. We answer in the negative.

A trial court may direct "either or both parents to support a child *in the manner specified by the order.*" TEX. FAM.CODE ANN. § 154.001(a) (Vernon 1996) (emphasis added). By using the phrase "in the manner specified by the order," the legislature implicitly granted the trial judge leeway in determining the manner in which support is to be used.

■ So long as the manner specified by the court rationally comports with the purpose of child support, we are hard-pressed to say that the court exceeded the grant of authority implicit in section 154.001(a) and abused its discretion. This is so for the simple reason that the court's action followed applicable guidelines and principles. And, of import is the truism that the purpose of child support is to fulfill the monetary aspect of a parent's duty to support.[2]

■ Further, the words used by the court at bar in describing the manner for which the $100 can be expended, that is for the "general health, maintenance, education and welfare of . . . Jeffrey" are nothing other than synonyms for the general duty of a parent to support a child. Again, the duty imposed by law includes the task of maintaining the child and caring for his needs both physically, medically, and educationally. *Mitchell v. Davis, supra;* TEX. FAM.CODE ANN. § 151.003(a)(3). Assuring that a portion of the support payment is used for the "general health, maintenance, education and welfare of" Jeffrey is simply assuring that the boy is cared for physically, medically, and educationally.

In sum, the directive informing Rodney and Deborah how the funds were to be spent comported with the purpose of child support. Thus, the trial court not only had the authority to so restrict their use, but also acted within its discretion.

### Issue Two

■ Did the court err in ordering the child's mother to participate in the decision concerning how the $100 was to be expended? That is the second question posed by Rodney. To it, we also answer in the negative.

---

**2.** That this is true is also illustrated by other truisms. The first is that "[c]hild-support payments are for the benefit of the children, not the parents." *Hill v. Hill,* 819 S.W.2d 570, 572 (Tex.App.—Dallas 1991, writ denied). The second is that the amount of the payment is not only dependent upon the ability of the parent to pay, *In re Striegler,* 915 S.W.2d 629, 639 (Tex.App.—Amarillo 1996, writ denied), but also the needs of the child. *Smith v. Smith,* 651 S.W.2d 953, 955 (Tex.App.—Fort Worth 1983, no writ); *Holt v. Holt,* 620 S.W.2d 650, 651 (Tex.Civ.App.—Dallas 1981, no writ); TEX. FAM.CODE ANN. § 154.123(b)(1), (9) & (17) (Vernon 1996). Given that the payments are for the benefit of the *child* and that their amount is influenced by the *child's* needs, it defies logic to suggest that they have a purpose other than to satisfy a parent's duty to financially support his offspring.

Both Rodney and Deborah had, and have, a duty to support Jeffrey, their son. *In re R.D. S., supra.* So too, are they the joint managing conservators of the boy. As such, each has the rights and duties *vis-a-vis* the boy as specified by the court. *See* TEX. FAM.CODE ANN. § 153.134(b)(2) & (4) (Vernon 1996) (directing the court to allot the rights and duties with regard to the child between the joint conservators). One such right bestowed upon both included the right to confer with the other parent "to the extent possible before making a decision concerning the health, education, and welfare of the child." *Id.* at § 153.073(a)(1)(B). In other words, the court authorized both parents to jointly make decisions "to the extent possible," about the boy's health, education, and welfare. In so ordering the parents to act, it implicitly bound them with the duty to make the decisions jointly, to the extent possible.[3]

Section 153.134(b)(2) of the Family Code obligates the court to "specify the rights and duties of each parent regarding the child's physical care, support, and education" when it appoints both parents as joint conservators. We have been cited to no limitation upon the manner in which the court may parcel those rights. Nor did our own research uncover any. More importantly, in allowing the court to appoint joint conservators the legislature undoubtedly intended to permit the court to grant the conservators joint and common rights if circumstances so warrant. The name alone, *joint* managing conservators, illustrates as much as do various of the factors which the court must consider before ordering joint conservatorship. They include: 1) whether the child would benefit from *joint* management, 2) whether the parents can reach "*shared* decisions" in the child's best interest, and 3) whether each parent can encourage and accept a positive relationship between the child and each other. TEX. FAM.CODE ANN. § 153.134(a)(1), (2) & (3) (emphasis added). Given this, it is obvious that the legislature both contemplat-

ed and acquiesced in the likelihood that the rights over the child could be exercised jointly.

So, because Deborah and Rodney are joint managing conservators and the court gave both of them the right to jointly determine "to the extent possible" issues concerning the health, education, and welfare of Jeffrey, it is quite reasonable for the court to have allowed both parents to have input into how the $100 in child support will be expended. That is precisely what the court did here. Consequently, we find no abused discretion.

That one or the other parent may become obstreperous, as suggested by Rodney, and interfere with the court's directive to act jointly, does not sway us otherwise for several reasons. First, no evidence appears of record indicating that such had occurred or will occur in the future. Thus, without any evidence upon which to base the conclusion that one or both parties will be unreasonable, we surely cannot hypothesize that they will.

Second, and as previously discussed, statute obligated the trial court to weigh certain criteria before imposing the status of joint conservators upon each parent. *See* TEX. FAM.CODE ANN. § 153.134(a). Various of those criteria entailed the ability of the parents to act in unison for the benefit of Jeffrey. Since no one argues otherwise, we must presume that the court abided by the statutory directive and considered those indicia. Furthermore, we must presume that it resolved them in favor of appointing joint conservators. *See Pharo v. Chambers County*, 922 S.W.2d 945, 948 (Tex.1996) (holding that in the absence of findings of fact and conclusions of law, the appellate court must presume that the trial court made findings supporting its judgment). In other words, we must presume that the court found that the parents could act jointly. Moreover, we are not at liberty to ignore this presumption merely because Rodney speculates that his wife may cause some problem at a later time.

**3.** As taught years ago by Professor Bruce Kramer, Maddox Professor of Law, Texas Tech University School of Law, accompanying each right is a correlative duty. *See* Wesley N. Hofeld, *Fundamental Legal Conceptions*, 23 Yale L.J. 16, 30–32 (1913) (discussing what has become known as the Hofeldian terminology of correlatives). Here, the correlative to the right to make joint decisions is the duty to jointly make decisions concerning the boys' health, education, and welfare, when possible.

### Issue Three

■ Rodney next asks whether the trial court erred in retaining the authority to resolve disputes between the joint conservators regarding how the $100 would be expended. We again answer in the negative.

Statute vests the trial court with continuing jurisdiction over matters of conservatorship and child support. TEX. FAM.CODE. ANN. § 155.003(a) (Vernon 1996). So too does it grant that jurist "all powers necessary for exercise of its jurisdiction and enforcement of its lawful orders, including authority to issue the writs and orders necessary or proper in aid of its jurisdiction." TEX. GOV'T CODE ANN. § 21.001(a) (Vernon 1988).

Here, the court ordered that the $100 be expended for the general health, education, maintenance, and welfare of Jeffrey. We previously determined that it had the power to enter that edict. Having that power, it also had the authority to do those things necessary to enforce the order and assure that the child support was being so expended. *Id.* Furthermore, the directive that it would retain ultimate authority to approve expenditures for Jeffrey's health, education, maintenance, and welfare if the boy's parents could not agree is little more than an assertion of its power granted under section 155.003(a) of the Family Code and section 21.001(a) of the Government Code.

In short, the trial court had the authority to retain jurisdiction over the disbursement of the monies for the benefit of Jeffrey when the conservators could not agree. Thus, we find no abused discretion as to that part of the order.

### Issue Four

■ Through his last issue, Rodney asks if the trial court erred in awarding Jeffrey the funds remaining in the account once Rodney's duty to pay child support ceased. The answer is simply no.

Although no conclusive authority directly addressing the query was uncovered, we nevertheless found guidance by analogy to a similar legal transaction. In pursuing the analogy, we initially dissected the primary transaction involved, the payment of child support, which was comprised of several elements: 1) the payment by one parent to another parent, 2) of monies, 3) for the benefit of a specified child. These elements liken amazingly to those of a trust.

■ While no particular form of words is needed to create a trust, *Rippstein v. Unthank,* 380 S.W.2d 155, 157 (Tex.Civ. App.—Amarillo), *rev'd on other grounds,* 386 S.W.2d 134 (Tex.1964); *Pottorff v. Stafford,* 81 S.W.2d 539, 540 (Tex.Civ.App.—El Paso 1935, writ ref'd), such an arrangement arises when a confidence is reposed in one person for the benefit of another with respect to property held by the former for the benefit of the latter. *Rippstein v. Unthank,* 380 S.W.2d at 157.[4] The property involved, its object or purpose, and the beneficiary need only be clear for a trust to be established. *Rippstein v. Unthank,* 380 S.W.2d at 157. In other words, a trust arises when specific property is given to one via an agreement specifying that the property will be used for the benefit of another. These elements effectively describe what happened at bar when the court ordered child support in general, and the $100 deposit in particular.

In providing support payments, the payor is giving specific property to another. Furthermore, and as a matter of law, the property is being given to the other with the specific understanding, and obligation, that it be used for the benefit of the payor's offspring. *Hill v. Hill,* 819 S.W.2d 570, 572 (Tex.App.— Dallas 1991, writ denied); *Comeaux v. Comeaux,* 767 S.W.2d 500, 503 (Tex.App.— Beaumont 1989, no writ). Given this, we conclude that the transaction has the elements of a trust as defined above. Thus, having such elements, we further conclude that in ordering child support, the trial court

---

4. Well known treatises similarly characterize a trust relationship. For instance, both *Scott on Trusts* and the *Restatement (Second) on Trusts* define it as a fiduciary relationship with respect to property requiring the recipient of the property to deal with it for the benefit of another. 1 A. Scott & W. Fratcher, *Scott on Trusts* § 2.3 (4th ed.1987); *Restatement (Second) on Trusts* § 2 (1959). Furthermore, the relationship arises pursuant to the intent of the party transferring the property that the *res* be held for the benefit of another. *Id.*

is creating for all practical purposes a "hybrid express" trust wherein the payor is the trustor, the payee is the trustee, and the child is the beneficiary.

We characterize the trust as a "hybrid express" because it does not fit within the parameters of the usual trusts we have come to know. For instance, a resulting trust arises when needed to prevent fraud and unjust enrichment, *Nolana Dev. Ass'n v. Corsi*, 682 S.W.2d 246, 250 (Tex.1984), as does a constructive trust. *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex.1974). Under each, the trustee is obligated to simply convey the trust *res* to the beneficiary or as directed by him. *Nolana Dev. Ass'n v. Corsi*, 682 S.W.2d at 250 (dealing with a resulting trust); *Talley v. Howsley*, 142 Tex. 81, 176 S.W.2d 158, 160 (1943) (discussing a constructive trust). But, with the type of trust created here, the trustee is not merely holding property for the benefit of the child. Its duty is to *administer* that property for the health and welfare of someone lacking legal capacity to do it himself. Implicit in the duty to so administer lies the right to exercise discretion with regard to how the funds will be expended. In other words, the trustees at bar may neither simply deliver the money to or be subject to the whims of the child.

As for an express trust, we recognize that the act creating it is volitional. That is, it arises from the agreement or acts of the trustor and trustee. *See Jameson v. Bain*, 693 S.W.2d 676, 680 (Tex.App.—San Antonio 1985, no writ). Furthermore, the intent of the party conveying the *res* establishes the trust purpose and duration. Yet here, judicial edict not only compels the transfer, but provides the intent establishing the trust purpose and duration.

So, as can be seen, the transaction involved here fits neatly in none of the commonly recognized forms of a trust. But, because it involves an intent (though judicially expressed), a specific purpose (though judicially designated), and a specific duration (though

judicially set), it is much like an express trust. Thus, we are compelled to treat it like an express trust.

Next, that the court has the authority to create an express trust, like that at bar, is indisputable. Both statute and case law allow it. *See* TEX. FAM.CODE ANN. § 154.003(4) (Vernon 1996) (stating that the court can order a parent to set aside property for the benefit of his child and to fulfill his support obligation); *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 138 (Tex.1977) (holding that upon divorce the rents, revenues, and income from a spouse's separate property may be set aside for the support of the minor children); *Hendrick v. Hendrick*, 222 S.W.2d 281, 285 (Tex.Civ.App.—Amarillo 1949, no writ) (recognizing the court's authority to impose a trust upon property of a parent or parents from which child support would be paid). When the court creates an express trust, the parties are to administer it as specified in the order creating it. TEX. FAM.CODE ANN. § 154.003(4). Thus, if the terms of the order dictate how the *res* is to be distributed during its life, the *res* must be so distributed. Further, if they direct how it is to be distributed at termination (assuming the directive comports with the purpose of underlying the initial creation of the trust), it must be so distributed. *See Restatement (Second) of Trusts* § 345 (1959) (stating that the trust be distributed as per the trust agreement upon termination); TEX. PROP.CODE ANN. § 112.053 (Vernon 1995) (stating that the trustor may provide in the trust instrument how property may or may not be disposed upon termination of the trust).[5]

In sum, the effect of the trial court's order was to place the $100 support payment in trust for the benefit of Jeffrey. Legal authority so empowered the court. So too did it allow it to dictate the terms by which the trust and its *res* would be administered. Furthermore, in declaring that the trust would be administered by delivering the corpus remaining at the time of its termination to the individual for whose benefit the *res*

5. Logic further dictates that if the trial court had power to create the trust and designate its manner of administration, it also had the power to designate the terms upon which it would end and

how the *res* would be distributed at that time. Simply put, the termination of the entity and distribution of its corpus is but one more step in the administration of the trust.

was initially given to the trustee, it did not abuse its discretion. In other words, the trial court's decision at bar comported with applicable guidelines and principles and was not an abuse of discretion.

Accordingly, we affirm the "Order on Motion to Modify in Suit Affecting the Parent–Child Relationship."