# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00293-CV

**T. W. and C. N., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF BASTROP COUNTY, 423RD JUDICIAL DISTRICT
NO. 12-15226, HONORABLE CHRISTOPHER DARROW DUGGAN, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

After a bench trial, the trial court terminated the parental rights of appellants T.W. and C.N. to their children, A.N., their daughter born in May 2005, and D.N., their son born in May 2012. On appeal, T.W. and C.N. raise a single issue challenging the sufficiency of the evidence that termination is in the children's best interest. We affirm the trial court's order of termination.

### Factual Summary

Father C.N. was incarcerated at the time of trial and had been since about November 2011, shortly before D.N. was born. T.W. has a total of six children and her older four children had already been removed from her care and placed with T.W.'s mother before the removal of A.N. and

D.N.[1]  When D.N. was born, both he and mother T.W. tested positive for cocaine.  The Department

placed A.N. and D.N. with T.W.'s aunt, but they were removed less than a week later because T.W.

and her aunt got into a physical fight when the children were present, the aunt violated the safety

plan, and the aunt reported that she did not know where D.N. was or who had him.

The Department next placed both children with foster parents Cherie W. and her

husband, giving T.W. weekly visitations.  Cherie testified that A.N. was well-behaved at first but

that her behavior quickly grew impossible to handle and that she would kick and scream when she

was told no or told to do something she did not want to do.  A.N.'s "worst days" were usually the

two days following a visit with T.W. but Cherie also said that if T.W. missed a visit, A.N. "would

get angry, too.  So she was—she just was in a fit."  Cherie testified that after about two months, she

and her husband asked the Department to remove A.N. because her behavior was "out of control."

A.N. was briefly placed in another foster home, and then spent two weeks in a

psychiatric hospital before being moved to a residential treatment center, where she was living at the

time of trial.  Cherie testified that although the family had to have A.N. removed, they were still in

contact with her, spoke to her on the phone frequently, visited her, and had her come to their house

for holidays.  Cherie thought that A.N. could learn to correct her behavior "with a lot of counseling"

and a "strong, consistent home," and she said she maintained a relationship with A.N. "[b]ecause

I love her.  I really, really love her."

---

[1] T.W.'s one-year-old daughter was hospitalized in 1997 after being shot in the leg while in her mother's care; in 1998, the Department determined that T.W. was addicted to crack cocaine and neglecting her two children; in 2001, T.W. gave birth to her third child, who tested positive for cocaine, barbiturates, and amphetamines and showed signs of withdrawal; and in 2002, T.W. gave birth to her fourth child, who also tested positive for cocaine and showed signs of withdrawal.

2

D.N. had lived with Cherie and her husband since shortly after his birth, and Cherie testified that at the time of trial, he was thriving and showed no medical problems. She said when he was initially placed in their home, he was going through withdrawal and "[h]is whole little body would tremble. He'd sweat. I mean the baby would sweat, like every hour I'd have to change his diaper." Being held stopped his body from shaking, but he would start to shake again whenever he was put down. The constant shaking eased after about four weeks and became intermittent instead of constant, and it finally stopped after two or three months. Although D.N.'s doctors did not see any medical issues at the time of trial, they also cautioned that issues related to drug addiction can arise "until he's maybe four or seven."

Cherie and her husband wanted to adopt D.N. When asked if they might adopt A.N., she answered, "We love [A.N.], and if [A.N.] can get the help that [A.N.] needs, we would consider that. But right now at this time where she's at in her state of mind I can't help her. I need her to have more help before I can commit to her."

Therapist Gracie Romo worked at A.N.'s residential treatment center. A.N. was placed at the center because of her aggression and self-harming, and Romo said that A.N. threw frequent tantrums, kicked, bit, hit, threw furniture, and tried to run away and that she hears voices that "tell her to run" or that are "angel voices." A.N. has been diagnosed as having ADHD, oppositional defiance, and aggression, and she took a mood stabilizer, an ADHD medication, and melatonin to help her sleep. A.N. was receiving counseling two or three times a week and had made progress in controlling her temper and learning to calm herself. However, Romo said that A.N.'s behavior worsened in the evening, when her medications "run out." She was also getting treatment for

3

incontinence, encopresis, and recurring urinary tract infections, and the treatment center was working on her toilet training. A.N. was about a year behind in school but was making progress. Romo believed it could be one or two years before A.N. no longer needed intensive psychiatric and psychological intervention. Romo could not say exactly why A.N. did not display her current array of behavior before she was removed from T.W.'s care, but although she acknowledged that removal from home can be a trauma that causes children stress, she did not attribute all of A.N.'s problems to her being removed from T.W.'s care. Romo said A.N. has happy memories from her foster family and has talked in therapy about being physically abused by her mother. Romo knew of only one phone visitation between A.N. and T.W., and said A.N. frequently calls Cherie.

T.W. testified that the night she gave birth to D.N., she went to a party where she had an alcoholic drink into which someone had put cocaine but said that was the only time during her pregnancy that she used cocaine or alcohol. Tests showed, however, that there had been ongoing use of cocaine during the pregnancy. When A.N. was an infant, T.W. left a court-ordered drug treatment program early, and she last attended an NA meeting about three months before trial. Two of T.W.'s drug tests, a urinalysis and a hair follicle test, came back positive for cocaine use about one month before trial, and T.W. testified that she intends to get sober, saying, "I'm fixing to start NA/AA, I don't hang with the non-positive people, I hang with—I go to church. . . . I go[] to like a family member if I have a problem and want[] to talk it out."

T.W. testified that she had never had a job and that she got food stamps and disability benefits because she is deaf in one ear. She had not graduated from high school or attempted to earn her G.E.D., nor did she have a driver's license. She missed ten of fifteen scheduled visitations with

4

A.N. because she lacked transportation or got lost when she attempted to attend. She testified that she had spoken to A.N. on the phone fifteen times since A.N. was removed from her care, although that frequency was disputed by other witnesses. She said she visited D.N. four or five times, and her last visit was five months before trial.

T.W. denied that A.N. had mental health or behavioral problems and said that A.N. never threw temper tantrums while in T.W.'s care. T.W. also testified that she did not know about A.N.'s medical or dental care before her removal because A.N. mostly lived with T.W.'s mother. T.W. testified that A.N. had been toilet trained since she was five and that she was not having problems using the toilet before her removal. T.W. admitted that A.N. had never had a stable home and that A.N., T.W., and C.N. moved from home to home or frequently stayed with T.W.'s mother. C.N. and T.W. had been together about fifteen years, and T.W. testified that C.N. slapped and choked her and that she called the police six or seven times. Despite that violence, T.W. testified that C.N. was a good father.

C.N. was serving a six year sentence for burglary, had already served eighteen months, and was waiting on a parole decision at the time of trial. He had a criminal record dating back to 1991 for burglary, assault, cocaine possession, delivery of a controlled substance, evading arrest, and tampering with evidence. Asked about his criminal history and whether he was "going to do that ever again," he answered, "I'm going to try not to." C.N. was in the process of earning his G.E.D., had a job ready to start as soon as he was released, and planned to live with family until he saved some money. C.N. wanted his sister to care for the children until he was released from prison, but she never attended any hearings or filed any paperwork in an attempt to have the children placed with her. C.N. had not accessed any services during his incarceration.

5

According to C.N., the police were called about three times due to domestic violence between him and T.W., not six or seven times as T.W. had testified, and up until his recent incarceration, he "pretty much raised" A.N., with help from T.W.'s mother. C.N. denied that A.N. had any mental health problems before the Department took custody of her. C.N. testified that T.W. had used cocaine during her pregnancy with D.N. and that they had fought about it a "couple of times," but he never called the Department or sought other help. C.N. had not seen A.N. since just before he was incarcerated and had never met D.N., although he sent him a birthday card.

Marjorie Proutt, A.N.'s teacher in 2011 and 2012, testified that A.N. had "good and bad days," "didn't like the word no," and was toilet trained while in Proutt's class. She testified that A.N. would yell, tap or sit on her desk, lag behind, refuse to sit, or challenge other students if they looked at her. Proutt made accommodations to lessen A.N.'s disruptive influence but said, "I didn't see the progress that she should have made, because other things was in the way. But I believe that she could have mastered more than what she [did], but it was just something there that was keeping her from grabbing it and taking on with it."

A therapist who worked with T.W. during the pendency of this case testified that the positive drug tests about two months before trial raised his concerns about her "impulsive decision making." He said her decision to use cocaine "says that she made an impulsive decision, that placed her and her children at risk." He said T.W. did well in her work on protective parenting concepts, but her impulsive decision-making was an "ongoing issue" that he believed "is an area that would place children consistently at risk."

Dallas Skeens, a Department caseworker, testified that aside from failing two recent drug tests, missing two-thirds of the scheduled visitations with A.N., and not attempting to find a job, T.W. largely complied with the rest of the requirements set out by the service plan. Skeens testified that C.N. had not completed any required services, but Skeens did not know what services were available while C.N. was incarcerated. Skeens had concerns about C.N.'s level of interest in obtaining custody of the children. He believed termination was in the children's best interests because the parents had not shown they can "provide even close to the type of stable, structured environment, especially that [A.N.] needs, that [D.N.] may need as he grows up if he develops any special needs, based on his exposure to cocaine at birth. And I think that the most suitable thing for both children is to be adopted legally and permanently, maintain a stable environment where we would have more assurance that they would receive all the services that they need."

Skeens was very satisfied with the care A.N. had been receiving in her residential center, and he believed she needed continuing counseling and intervention in a secure setting. The Department hoped that A.N. would eventually be placed in a less-restrictive environment and be adopted, and if at all possible, the Department wanted A.N. to be placed with D.N. If D.N.'s foster family is not willing or able to adopt A.N. at the time she is able to move to a less-restrictive environment, the Department will look for another foster placement nearby.

D.N.'s guardian ad litem testified that D.N. was thriving in foster care and that she did not believe T.W. could provide a safe and healthy environment for him. A.N.'s guardian ad litem testified that D.N.'s foster family loves A.N., talks to and visits her, and wants her to get the help she needs, and that A.N. understands that she has to learn to control her behavior. A.N.'s guardian ad

litem did not believe T.W. or C.N. could provide the stable, structured environment A.N. needs, was concerned that T.W. would not stay sober, and did not believe T.W. understood A.N.'s special needs. She testified that it was in A.N.'s best interest for T.W.'s and C.N.'s parental rights to be terminated so she could get the treatment she needs to become adoptable. A.N. testified both that she wanted to return to her mother and that she wanted to live with Cherie and her brother, and she testified that she was worried that her mother would use drugs.

**Discussion**

Both T.W. and C.N. appeal, arguing that the evidence is legally and factually insufficient to support a finding that termination was in the children's best interests. They contend that the Department did not rebut the strong presumption that a child is best served by the preservation of the parent-child relationship. *See In re K.C.M.*, 4 S.W.3d 392, 393-95 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). T.W. asserts that "[b]ut for the one positive drug test for cocaine . . ., [T.W.] would still have the ability to regain custody of her children." C.N. asserts that the Department did not attempt to help him engage in services during his incarceration and essentially ignored him during the pendency of the case. Both parents note that A.N. did not show any behavior problems before being taken into the Department's custody.

D.N. was born addicted to cocaine, as were two of T.W.'s older children. T.W. denied using cocaine while pregnant other than having one drink laced with cocaine the night she went into labor, but tests run in the hospital upon D.N.'s birth showed usage well beyond that level. She has a history of usage dating back to when A.N. was an infant; she failed a drug test two months before trial; and at the time of trial, she last attended an AA or NA meeting three months before trial

8

but said she was going to start attending again. T.W. missed ten of fifteen visitations with A.N., missed many of her therapy sessions, does not have and had made no efforts to find employment, had not attempted to get a G.E.D., and has a long history of instability in her living arrangements.

Alarmingly, despite all the evidence of A.N.'s mental health issues, T.W. testified that A.N. had no such issues and never had behavior problems while in T.W.'s care. However, A.N.'s teacher in the 2011-2012 school year testified that A.N. was disruptive, did not respond well when told "no," and needed special accommodations, and Cherie testified that A.N.'s behavior worsened after she had a visit with T.W. or if T.W. canceled a visit, which she frequently did.

C.N. has a twenty-year criminal history and was incarcerated at the time D.N. was born. He hoped to be released on parole, but parole was not a certainty at the time of trial. C.N. was given a copy of the service plan while he was incarceration, but there is no evidence that he asked whether any services were available to him. Further, he knew that T.W. was abusing cocaine while pregnant with D.N., did not seek help to get her to stop, and did not make arrangements for A.N. and D.N. to stay with someone other than T.W. while he was incarcerated.

Both children's guardians ad litem and A.N.'s therapist opined that it was in the children's best interest for the parents' rights to be terminated. T.W.'s therapist testified that T.W.'s impulsive decision making would place children at risk. D.N. was thriving in foster care, and Cherie said she and her husband hoped to adopt him. She also testified that they were still in close contact with A.N. and would be open to the possibility of adopting her. The Department intended to keep A.N. in her current placement at the treatment center while she received mental health care and learned to control her behavior, at which point they hoped to move her to a less restrictive

9

environment and eventually to arrange for her to be adopted. The Department and D.N.'s foster parents wanted to keep the siblings close to each other. A.N. testified both that she wanted to live with her mother and that she wanted to live with D.N. and Cherie.

It was for the trial court to consider the evidence and make credibility determinations, and we will not second-guess those decisions. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). When we evaluate the evidence in light of the factors set out in *Holley v. Adams*, particularly considering the Department's plans for the children; the children's current placements and needs; C.N.'s long criminal history and uncertain future; and T.W.'s drug abuse, inability to attend visitations and therapy appointments, and refusal to recognize A.N.'s mental health needs, we hold that legally and factually sufficient evidence[2] supported the trial court's finding that termination was in the children's best interest. *See* 544 S.W.2d 367, 371-72 (Tex. 1976); *see also In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (evidence of parent's "inability to maintain a lifestyle free from arrests and incarcerations" is relevant to best interest determination); *In re M.D.S.*, 1 S.W.3d 190, 199-200 (Tex. App.—Amarillo 1999, no pet.) (incarceration standing alone does not amount to endangering conduct, but it is relevant to issue of endangerment and to child's need for current and future stability and permanence). We overrule the parents' sole issue on appeal and affirm the trial court's order of termination.

---

[2] *See In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002) (discussing legal and factual sufficiency review in termination cases).

_____

David Puryear, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed:   October 21, 2013