02-10-094-CV















 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-10-00094-CV

 

 


 
 
 In the Interest of L.T. and K.B.,
 Children
 
 
  
 
 
  
 
 


 

 

----------

 

FROM THE
323rd District Court OF Tarrant
COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          Appellant A.L.
(Mother) appeals the trial court’s order terminating her parental
rights to her children, L.T. and K.B.  Appellant R.T. (Richard)
appeals the termination of his parental rights to L.T., and appellant G.B. (George)
appeals the termination of his parental rights to K.B.[2]  The parents contend that the evidence is
legally and factually insufficient to show that termination of their rights is
in the best interests of the children, and Mother also argues that the trial
court erred by denying her motion for continuance.  We affirm.

Background Facts

          Mother and Richard are the parents of
L.T.; Mother and George are the parents of K.B. 
On April 2, 2009, while the children were living with Mother, George,
and George’s roommate, Child Protective Services (CPS) received an allegation
that methamphetamine was being manufactured in a garage next to the home.[3]  One of CPS’s employees, Melinda Esquibel, went with four narcotics officers to the home,
where they found Mother’s sister, Melinda Bednar.  Mother was not initially at the home, but the
children were, and Bednar was holding L.T.  Neither father
was there.  The children stunk because
they were dirty and their diapers had not been recently changed.

          Outside of the home, Esquibel saw surveillance cameras, and inside the home, she
saw clutter, unwashed dishes, what she believed to be a drug pipe with liquid
inside, and marijuana that was within reach of L.T.  Eventually, Mother arrived at the residence; she
had dark circles under her eyes, was “very slurred in her words,” and was not
engaged in her conversation with Esquibel.  Mother admitted that she was using marijuana
and said that she had used methamphetamine that day.

          After obtaining a search warrant,
officers found a meth lab at the property where the children lived.  Specifically, they discovered, in a small
garage outside the residence, digital scales, “tons of” ephedrine tablets,
lithium batteries, Coleman fuel, anhydrous gas generators, and a gas mask,
which are all items related to methamphetamine production.  They also discovered a full syringe located
underneath a seat cushion inside the house; the syringe could have been reached
by L.T.

          CPS removed the children from the home
and told Mother that she would need to work services, including drug treatment,
to get the children back.  Esquibel took the children to a hospital, where L.T. tested
positive for methamphetamine.[4]

          The Department of Family and
Protective Services (the Department) filed a petition that asked for, among
other relief, termination of each parent’s rights to the children if
reunification could not be achieved.  The
Department attached an affidavit that detailed the findings at the children’s
home.  The trial court granted the
Department temporary sole managing conservatorship of the children, appointed an
attorney ad litem to represent them, and limited the parents’ access to them to
times arranged by the Department.  The
parents filed answers to the Department’s petition.  The children began living with a foster
family.

          In May 2009, the Department filed service
plans that described the children’s history and needs and gave the parents
several particular tasks to achieve reunification with them.  Later that month, the trial court found that
the parents understood the service plans.

          A few days before the termination trial
in February 2010, Mother filed a motion for continuance on the grounds that her
attorney was unprepared to proceed and that she needed more time to complete
the service plan.  Richard also asked for
a continuance.  During a hearing on Mother’s
continuance motion before the trial began, her counsel explained that Mother
was awaiting resolution of a criminal charge. 
The trial court denied the continuance requests.

          After the trial concluded, the court
terminated each parent’s rights to the children.  It found that each parent knowingly placed or
allowed the children to remain in conditions or surroundings that endangered
their physical or emotional well-being and engaged in conduct or knowingly
placed the children with persons who engaged in conduct that endangered their physical
or emotional well-being.  The court also
found that Mother and George constructively abandoned the children and that
termination of each parent’s rights was in the children’s best interests.  The Department became the children’s
permanent managing conservator and received authorization to place them for
adoption.  The parents each filed a
notice of appeal.

Best Interests of the Children

          Each parent contends that the trial
court’s termination order should be reversed because the evidence is legally
and factually insufficient to show that termination of their rights is in the
best interests of the children.  A parent’s
rights to “the companionship, care, custody, and management” of his or her
children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer,
455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115
S.W.3d 534, 547 (Tex. 2003).  “While parental rights are of constitutional
magnitude, they are not absolute.  Just
as it is imperative for courts to recognize the constitutional underpinnings of
the parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In re C.H.,
89 S.W.3d 17, 26 (Tex. 2002).

          In a termination case, the State seeks
not just to limit parental rights but to erase them permanently—to divest the
parent and child of all legal rights, privileges, duties, and powers normally
existing between them, except for the child’s right to inherit.  Tex. Fam. Code Ann. §
161.206(b) (Vernon 2008); Holick v. Smith,
685 S.W.2d 18, 20 (Tex. 1985).  We
strictly scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20–21; In re M.C.T., 250 S.W.3d 161, 167
(Tex. App.—Fort Worth 2008, no pet.).

          In proceedings to terminate the
parent-child relationship brought under section 161.001 of the family code, the
petitioner must prove that termination is in the best interest of the
child.  Tex. Fam. Code
Ann. § 161.001(2) (Vernon Supp. 2010); In re J.L.,
163 S.W.3d 79, 84 (Tex. 2005).[5]  Termination decisions must be supported by
clear and convincing evidence.  Tex. Fam. Code Ann. §§ 161.001, .206(a).  Evidence is clear and convincing if it “will
produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.”  Id.
§ 101.007 (Vernon 2008).

          In reviewing the evidence for legal
sufficiency in parental termination cases, we must determine whether the
evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were
proven.  In re
J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the evidence in the light
most favorable to the finding and judgment. 
Id.  This means that we
must assume that the factfinder resolved any disputed
facts in favor of its finding if a reasonable factfinder
could have done so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved.  Id. 
We must consider, however, undisputed evidence even if it is contrary to
the finding.  Id.  That is, we must consider evidence favorable
to termination if a reasonable factfinder could and
disregard contrary evidence unless a reasonable factfinder
could not.  Id.

          We must therefore consider all of the
evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the factfinder’s province. 
Id. at 573–74.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder’s
determinations as long as they are not unreasonable.  Id. at 573.

          In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder’s
findings and not supplant the judgment with our own.  In re H.R.M., 209
S.W.3d 105, 108 (Tex. 2006).  We
must determine whether, on the entire record, a factfinder
could reasonably form a firm conviction or belief that termination of the
parent-child relationship would be in the best interest of the child.  See
Tex. Fam. Code Ann. § 161.001(2); C.H., 89
S.W.3d at 28.  If, in light of the entire
record, the disputed evidence that a reasonable factfinder
could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief
or conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d at 108.

          There is a strong presumption that
keeping a child with a parent is in the child’s best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child
in a safe environment is also presumed to be in the child’s best interest.  Tex. Fam. Code Ann. §
263.307(a) (Vernon 2008). In evaluating the parent’s willingness
and ability to provide the child with a safe environment, we may consider,
among other factors, the child’s age and physical and mental vulnerabilities;
the frequency and nature of out-of-home placements; the magnitude, frequency,
and circumstances of the harm to the child; the results of psychiatric,
psychological, or developmental evaluations of the child’s parents; whether
there is a history of substance abuse by the child’s family or others who have
access to the child’s home; the willingness and ability of the child’s family
to seek out, accept, and complete counseling services; the willingness and
ability of the child’s family to effect positive environmental and personal
changes within a reasonable period of time; and whether an adequate social
support system consisting of an extended family and friends is available to the
child.  Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

          Other factors used to determine the
best interest of the child include the desires of the child; the emotional and
physical needs of the child now and in the future; the emotional and physical
danger to the child now and in the future; the parental abilities of the
individuals seeking custody; the programs available to assist these individuals
to promote the best interest of the child; the plans for the child by these
individuals or by the agency seeking custody; the stability of the home or
proposed placement; the acts or omissions of the parent which may indicate that
the existing parent-child relationship is not a proper one; and any excuse for
the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976).  These factors are not exhaustive.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

The
parents’ poor decisions

 

          Mother’s
drug history and background

          During an interview that occurred a
day after the children’s removal in April 2009, Mother told Esquibel
that her drug of choice was marijuana, which she used twice a week, and that
she had been using methamphetamine on a daily basis.  Mother cared for the children while she was
under the influence of drugs. She believed that George also used methamphetamine.  A few days after the children’s removal,
Mother came to a visit with the children smelling like methamphetamine.  Mother had failed in the past to complete
outpatient treatment for her drug use, but she told Esquibel
that she would be willing to receive treatment at Recovery Resources in
Arlington.  Mother did not contact Esquibel after a telephone call on April 24, 2009.

          Mother’s involvement with drugs caused
her incarceration that lasted until the time of the termination trial.  CPS case worker Linda Phillips said that even
if Mother had not been incarcerated, she would be concerned that Mother could
not maintain a drug-free lifestyle and could not refrain from having a
relationship with someone involved with drugs, such as Richard.

          George’s
drug history and background

          George conceded that drugs were used
in his home and that the children possibly inhaled drug fumes.  He denied knowing of the methamphetamine lab
at the home.  George was not employed
when he talked to Esquibel, and he admitted that he
had sold drugs “all his life.”  He was in
jail when he talked to Esquibel because of the
methamphetamine that the officers found, but he said that he would be willing
to complete inpatient drug treatment.[6]

          George is not able to read or write,
and he remained in jail from April 2009 until the termination trial in February
2010.  He has a 2005 conviction for
possession of certain chemicals with the intent to manufacture methamphetamine,
of which he served a two-year sentence. 
He also has a 1990 conviction for delivering cocaine, of which he was placed
on ten years’ probation.

Richard’s evaluation with Dr. Nichelle
Wiggins and his personal history

 

          Dr. Nichelle
Wiggins, a licensed psychologist, evaluated Richard in August 2009.  Richard told Dr. Wiggins that his involvement
with the Department began because Mother and L.T. resided with a man who was
arrested for manufacturing drugs (presumably George), and L.T. tested positive
for methamphetamine.  Richard was not
surprised that there were drugs in the home because he knew Mother was using
drugs.  He expressed concern about
Mother’s neglect of L.T. because L.T. did not bathe sometimes and was not well
taken care of.  Richard acknowledged,
however, that he did not try to remove L.T. from Mother’s home because he was
also using drugs and “didn’t really know all his options of what he could have
done . . . , so he basically did nothing.”

          At the time of Richard’s interview
with Dr. Wiggins, he was living with a friend who was using drugs, and other
friends who visited him also used drugs.  Richard admitted that he had used drugs for twenty
years and that at one time, he used methamphetamine daily.[7]  Richard used methamphetamine intravenously,
by snorting it, and by eating it.  He was
able to buy drugs because he sold them.  He
told Dr. Wiggins, however, that because of his love for L.T. and prayer, he had
not used drugs for approximately four months before the interview.  But Richard had attended inpatient treatment
for his drug use at various times in the past and would “use [drugs] as soon as
he got out.”  Because of his drug
addiction, Richard had not had his own place to live since 2003.

          Richard had four children other than
L.T., but he did not remain active with those children and did not have contact
with three of them for fifteen years.  Richard
used drugs during his relationships with both of the mothers of his other four
children.

          Dr. Wiggins learned that Richard had
been arrested for burglary in 1996, possession of cocaine in 1997, and theft in
2006.  The theft occurred when he took a
flat bed trailer to sell it for money to buy drugs.

          Richard told Dr. Wiggins that he loved
L.T. and was willing to stop using drugs to be involved with her.  He said that he was employed helping
landlords do various jobs.

          Dr. Wiggins was concerned about
Richard’s ability to raise L.T. because of his failure to protect L.T., unhealthy
relationships, chronic drug use, legal problems, poor decisions, and absence as
a father; she believed that he was “a very high risk to relapse” because of his
twenty-year addiction and his decision to surround himself with people who used
drugs.  Dr. Wiggins was also troubled by
the way Richard answered certain questions. 
For instance, when Richard was asked if there was one thing that he
could change about himself, he said that he “wish[ed]
[he] was tall.”  Dr. Wiggins therefore
believed that Richard was not focused on L.T. and “highly recommended” that
L.T. remain in protective care because the “prognosis was poor for any kind of
significant progression.”

          Richard attended all of his visits
with the children.  In November 2009,
during one of the visits, he admitted that he sells drugs, and he blamed a
positive drug test on his drug-selling behavior.  Mother said that Richard bought a new truck
with money from selling methamphetamine.

          Phillips conducted an unannounced
visit of Richard’s house; Richard did not let Phillips enter a room where he
said that his cousin stayed, and Phillips also could not enter a locked storage
area.  Richard did not give Phillips
background information on his cousins that resided with him.  Phillips was concerned about the cleanliness
and child-friendliness of the home (for instance, there was a chainsaw on the
floor in Richard’s bedroom).  Phillips
believed that Richard was not drug-free at any point during the case, and she
opined that he did not have parenting skills necessary to provide for L.T.’s
needs.  Richard told Phillips that at the
time of the trial, he was making money by repairing and selling trailers.

The parents’ compliance with the service
plans

          When Phillips began her involvement in
the children’s case, George was already incarcerated but Mother was not.  Phillips did not discuss the service plan with
Mother, however, until June 2009, at which time Mother was incarcerated.  While in jail, Mother worked on some of the
service plan and progressed toward obtaining a GED.  She also participated in substance abuse
programs (including Christians Against Substance
Abuse), a bible class, and other religious classes.  She did not complete parenting classes, a
psychological evaluation, or individual counseling, but Phillips did not
facilitate making those services available for Mother.  Mother wanted to resume her relationship with
Richard if she was released from confinement, but the timing of her release was
uncertain.  When Phillips was testifying
about the completion certificates that Mother received, she said, “The biggest
thing is what [parents] do when they get out of jail.”

          George did not take any classes while
confined and did not communicate with Phillips even though Phillips told George
that some of the classes could be completed while he was in jail.

          Richard completed the psychological
evaluation with Dr. Wiggins and parenting classes.  He also started a drug program at Merit Family
Services but was discharged in November 2009 for noncompliance because his
“lifestyle centered around his choice of drugs.”  He then started another drug program in
December 2009 and last visited that program in January 2010 (the month before
the trial began) before he was also discharged from it because of a positive
hair follicle drug test.[8]  Richard was also discharged from individual
counseling.  He tested positive for
methamphetamine in October 2009 and again in January 2010 (just a month before
trial); he acted surprised when he learned of these results.  Richard did not complete individual
counseling.

Possible familial placements

          After Esquibel
told Mother that the children would be taken outside the home, Mother gave Esquibel some names of relatives for possible placement but
was not able to give Esquibel contact information for
most of those people.  A few days
later, Mother gave Esquibel names of paternal cousins
but did not give Esquibel background information on
the cousins so that a home study could be completed.

          Richard asked that his aunt, Sue, be
allowed to care for the children, but Esquibel was
not able to contact Sue.

          George asked that his sisters, Helen
and Ellen, be able to keep the children, but he did not give contact information
for them, and Esquibel never talked to them.  George’s mother, Joyce, told Esquibel that neither Helen nor Ellen would be able to care
for the children, but Joyce asked that she be considered for placement.

          Joyce came to most of Richard’s visits
with the children and acted appropriately and lovingly.  Mother wanted the children to be placed with
Joyce.  However, at a family group
conference, Joyce allegedly said that she would not be able to keep her
daughter, Leanna Scoggins (one of K.B.’s aunts), away
from the children, and this concerned CPS because Scoggins had a “reason to
believe” CPS finding against her.[9]  Scoggins said that she would move in with
Joyce if the children lived there.  CPS
was also reluctant to place the children with Joyce because of her age (she was
seventy-six years old at the time of the trial), statements during visits that
the children “tire[d] her out,” her income, her housing instability, her
inability to protect the children,[10] and a
previous fatal accident her son had.  Phillips
never visited Joyce’s home, but Joyce failed a home study.

          Joyce testified at the termination
trial.  She said that she was living in a
two-bedroom apartment and that she would “love to take care” of the children.  She testified that she had high blood pressure
and arthritis in one knee but otherwise had good health.  She said that she would receive financial
help to care for the children.  She
explained that her son’s death occurred many years ago when he pulled a deep
fryer down on himself.

          Mother’s attorney also proposed Mary
Ciano as a placement option along with some of Mother’s other relatives,
Charles Bednar, Charlie Bednar,
and Loydean Bednar.  But Mary said that she could not care for any
more children, Charlie had a “reason to believe” finding for physical neglect
of her daughter, Charles had a physical neglect finding, and Loydean had a CPS history and three felony
convictions.  Thus, CPS believed that it
had exhausted all leads for placing the children with any of the parents’
family members.  Jennifer Thompson, a CPS
supervisor, said that she would be willing to continue looking at familial
placements.

The children’s
placement at the time of trial and the Department’s plan for the children

 

          The children’s foster mother said that
when she began caring for the children in April 2009, two-year-old L.T. did not
sleep or interact with people well.  She also
cried excessively and shoveled any food that she saw.  L.T. received developmental therapy, speech
therapy, behavioral therapy, and occupational therapy.  She became a “different child” from the time
she came into her foster parents’ care; she began talking, saying random
sentences, smiling and hugging, and acting more secure without crying.  L.T.’s foster mother recognized L.T.’s need
to receive special education once she started school because although L.T. had
made progress, she still lacked some cognitive skills.

          The children’s foster mother described
K.B., who was one and a half years old at the time of the trial, as a “perfect
little bundle of joy.”  But K.B. was also
somewhat developmentally behind (for instance, she was about four months late
in learning to walk and was not talking very much).  The foster mother did not want to adopt the
children but said that the children were welcome to stay in the home as long as
needed.

          The children had weekly one-hour visits
with Richard, and L.T. enjoyed the visits and left them in a good mood.  Richard always brought food, toys, and
clothes for both children (even though K.B. is not his child).

          Phillips opined that termination of
each parent’s rights was in the best interests of the children.  She said that the Department wanted the
children to be adopted, and she believed that finding adopting parents would
not be difficult, but she acknowledged that the children would need to be moved
from their foster parents to be adopted, which affects their stability.

The sufficiency of the evidence for
termination

          We
conclude that under the standards detailed above, these facts are legally and
factually sufficient to show, clearly and convincingly, that termination of
each parent’s rights is in the children’s best interests.  The Department proved that the children are
young and need developmental attention. 
They are unlikely to get sufficient attention in the parents’ care
because of Mother’s and George’s incarceration and each parent’s substantial connection
with a combination of using, distributing, or manufacturing drugs.[11]  See In
re M.R., 243 S.W.3d 807, 820–21 (Tex. App.—Fort Worth 2007, no pet.) (holding that termination was in the best interest of
children when a mother had a history of abusing drugs); In re S.B., 207 S.W.3d 877, 888 (Tex. App.—Fort Worth 2006, no
pet.) (relying on drug use as evidence supporting
termination of a father’s parental rights). 
In fact, the children developed better after they left the parents’ care
and began living in their foster home.

          The Department showed that the parents
were careless about whether the children could be harmed by their exposure to
drugs and the chemicals used to make them, and L.T. had in fact been harmed by
Mother’s and George’s drug-related choices because she tested positive for
methamphetamine.  None of the parents
completed all of the service plan, and the evidence is
scant that Mother or George sought out many of the required services while they
were incarcerated (although Mother participated in some drug and spiritual
counseling).  Neither Mother nor George
testified that they could remain drug-free outside of a confined environment, and
Mother told Esquibel that her “longest clean-time was
about a year and nine months.”

          Various members of the parents’ family
could not care for the children, could not be located, or were not qualified to
have custody of them because of previous negative involvement with the
Department or other factors.  The children
were in a stable, positive environment at the time of the termination trial,
and they could remain there until the Department found a permanent adoptive
home.

          Neither Mother nor George had been
found guilty of the charges related to CPS’s April 2009 investigation.[12]  Mother contends that the trial court should
have granted the Department permanent managing conservatorship of the children
and readdressed termination or reunification after she resolved her criminal
case.  But the evidence substantiated
Mother’s and George’s recent drug-related behavior regardless of whether they
were convicted of any specific act, and neither Mother nor George testified
that they were innocent of the charges against them or provided the trial court
with direct explanations of their behavior, which included leaving marijuana
and a syringe within the reach of L.T. and exposing her to methamphetamine.  Cf. In re N.A., No. 02-10-00022-CV, 2010 WL 3834640, at *9–11 (Tex.
App.—Fort Worth Sept. 30, 2010, no pet.) (mem. op.) (holding that the
evidence was factually insufficient to support the trial court’s best interest
finding when a mother’s aggravated robbery case was unresolved at the time of
the termination trial, the mother denied the aggravated robbery at trial, and
the Department was planning to return the mother’s children before her arrest).

          Based on all the facts described
above, we conclude that the evidence is legally and factually sufficient to
show that termination of each parent’s rights is in the children’s best
interests.  See Tex. Fam. Code Ann. § 161.001(2); H.R.M., 209 S.W.3d at
108; J.P.B., 180 S.W.3d at 573. 
Thus, we overrule both of George’s points, both of Richard’s issues, and
Mother’s first and second issues.

The Denial of Mother’s Motion for Continuance

          In her third issue, Mother argues that
the trial court erred by denying her motion for continuance that she filed a
few days before trial.  She relies on
section 161.2011 of the family code, which states, 

A parent whose rights are subject to termination in a
suit affecting the parent-child relationship and against whom criminal charges
are filed that directly relate to the grounds for which termination is sought
may file a motion requesting a continuance of the final trial in the suit until
the criminal charges are resolved.  The
court may grant the motion only if the court finds that a continuance is in the
best interest of the child.

Tex.
Fam. Code Ann. § 161.2011(a) (Vernon Supp. 2010).  As we recently explained,

          We review
a trial court’s ruling granting or denying a motion for continuance for an
abuse of discretion.  We do not
substitute our discretion for that of the trial court.  Instead, we must determine whether the trial
court’s action was so arbitrary and unreasonable as to
amount to a clear and prejudicial error of law.  The focus is on whether the trial court acted
without reference to guiding rules or principles.

In re Z.C.,
280 S.W.3d 470, 478 (Tex. App.—Fort Worth 2009, pet. denied) (footnotes and
citations omitted).

          Mother argues that the “rationale for
the application of [section 161.2011(a)] to grant the continuance is
essentially the same” as her argument that termination was not in the best
interests of the children.  But we have
upheld the trial court’s determination that termination was in the children’s
best interests.

          Also, although Mother’s trial attorney
stated during the motion for continuance hearing that Mother had an April 2010
trial date for her criminal case, the record does not establish that Mother’s
case was certain to be resolved at that time (Mother did not present any
evidence on the issue), and the Department’s attorney told the court that she
had spoken “with the Assistant District Attorney assigned to the case, and it
didn’t seem likely that [the case] was going to be resolved in April.”[13]  Next, although Mother’s trial attorney told
the trial court that she had “learned of additional family members that may be
able and willing to take custody of the children,” she did not say who those
relatives were (except for Mary Ciano, who, as stated above, said she could not
care for the children), explain why they were qualified to care for the
children, or elicit testimony from them during the brief continuance
hearing.  See Tex. R. Civ. P. 251 (requiring a showing of sufficient cause
for the granting of a continuance).  Moreover,
the children had already been in foster care for several months at the time of
the trial, and proceeding with the trial in February 2010 allowed the trial
court to expedite their permanent placement. 
“[T]he prompt and permanent placement of the
child in a safe environment is presumed to be in the child’s best interest.”  Tex. Fam. Code Ann. §
263.307(a).

          Finally, Mother’s written motion
failed to comply with rule 251 because it was not verified or supported by an
affidavit, and the trial court could have properly denied the motion on this
ground as well.  See Tex. R. Civ. P. 251; In
re M.M.F., No. 02-08-00014-CV, 2008
WL 5265033, at *14 (Tex. App.—Fort Worth Dec. 18, 2008, no pet.) (mem. op.); In re T.H., No. 02-07-00464-CV, 2008 WL 4831374, at *8–9 (Tex.
App.—Fort Worth Nov. 6, 2008, no pet.) (mem. op.); In re
E.L.T., 93 S.W.3d 372, 375 (Tex.
App.—Houston [14th Dist.] 2002, no pet.).

          For these reasons, we conclude that
the trial court did not abuse its discretion by denying Mother’s motion for
continuance.  See Z.C., 280 S.W.3d at 478.  We
overrule her third issue.

Conclusion

          Having overruled all of each parent’s
issues or points, we affirm the trial court’s judgment.

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL:  LIVINGSTON, C.J.;
MEIER and GABRIEL, JJ.

 

DELIVERED:  February 17, 2011











[1]See Tex. R. App. P. 47.4.





[2]To
protect the identity of the parties, we will identify them through initials or
portions of their names.  See Tex. Fam. Code Ann. § 109.002(d)
(Vernon 2008); Tex. R. App. P. 9.8(b).





[3]In April 2009,
L.T. was two years old and K.B. was a few months old.





[4]Esquibel’s involvement in this case ended in May 2009.





[5]None
of the parents challenge the grounds for termination under section
161.001(1).  See Tex. Fam. Code Ann. § 161.001(1).





[6]George
was arrested for possessing chemicals with the intent to manufacture
methamphetamine and other drug-related crimes. 
Mother was also arrested in connection with the drugs found at the
residence.  Mother’s and George’s
criminal charges were still pending at the time of the termination trial.





[7]Richard
also admitted his drug use and his knowledge of Mother’s methamphetamine use to
Esquibel.





[8]Richard
told one of his drug counselors that he had a meth lab in his back yard.





[9]Joyce
denied making this statement.  Scoggins
had been living with Joyce at the time of the trial for about six months.  Joyce said that she would remove Scoggins
from the home if needed.





[10]One
of CPS’s employees testified, “[Joyce] had been to the address where the kids
had been staying.  I can’t imagine that
she didn’t know the condition that they were living in.”





[11]We
recognize that a parent’s imprisonment “does not automatically establish that
termination of parental rights is in the child’s best interest.”  In re S.R.L., 243 S.W.3d 232, 236 (Tex. App.—Houston [14th Dist.]
2007, no pet.).





[12]The
trial court could have reasonably inferred that George was responsible for the
methamphetamine lab at his home because he had been previously convicted of
possessing materials to manufacture the drug.  See In re
R.D.S., 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ) (“[T]he trier of fact has the authority to weigh the evidence, draw
reasonable inferences therefrom, and choose between
conflicting inferences.”); see also In re
C.A.B., 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.)
(“A factfinder reasonably could infer that [a
mother’s] failure to submit to the court-ordered drug screening indicated she
was avoiding testing because she was using drugs.”).





[13]Mother’s
criminal trial date had been reset three previous times.