

In The

Court of Appeals

Seventh District of Texas at Amarillo

No. 07-16-00271-CV

IN THE INTEREST OF M.M.S. AND C.E.S., CHILDREN

On Appeal from the 316th District Court
Hutchinson County, Texas
Trial Court No. 41, 639, Honorable James M. Mosley, Presiding

October 6, 2016

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

E.S., the mother of M.M.S. and C.E.S.,[1] appeals the trial court's judgment terminating her parental rights to the children.[2] The children were seven and five years old, respectively, at the time of the trial. The trial court found by clear and convincing evidence that E.S.'s parental rights should be terminated pursuant to subsections (D), (E), (O), and (P) of Section 161.001(b)(1). *See* TEX. FAM. CODE ANN.

---

[1] Pursuant to Texas Rule of Appellate Procedure 9.8 the children and all parties will be referred to by their initials.

[2] The father, N.S., has not appealed the trial court's judgment terminating his parental rights and is not a party to this appeal.

§ 161.001(b)(1)(D), (E), (O), (P) (West Supp. 2016).[3]  The trial court also found by clear and convincing evidence that termination of E.S.'s parental rights was in the best interest of the children.  *See* § 161.001(b)(2).  E.S. appeals on the ground that the best interest finding entered by the trial court is not supported by legally or factually sufficient evidence.  She does not contest the trial court's findings regarding the predicate acts upon which the termination was based.  We will affirm.

Factual and Procedural Background

E.S. has a long history of involvement with the Department of Family and Protective Services (Department).  Additionally, E.S. has had involvement with the Oklahoma Department of Human Services, that state's equivalent to the Texas Department of Family and Protective Services.  The current case arose out of an incident on October 25, 2014.  Officer Stephanie Willoughby went to the apartment that E.S. shared with her boyfriend to conduct a "welfare check."  Upon arriving, Willoughby found that E.S. had been assaulted by her boyfriend, Clay, after she had forcefully kicked him out of the apartment.  Willoughby knew that E.S. had several warrants outstanding for traffic offenses and, as part of the assault investigation, arrested E.S. for these warrants.  After ascertaining that there was no one to take care of the children, Willoughby contacted the Department.

The Department's investigator, Wanda Trim, investigated the incident.  At the time of her visit with E.S., E.S. was in jail on the warrants.  E.S. advised Trim that she awoke to find Clay smoking marijuana in the apartment and asked him to leave.  This confrontation then escalated into Clay's assault of E.S.  While Trim was interviewing E.S. at the jail, E.S. denied that she had been using drugs and asserted she was simply

[3] Further reference to the Texas Family Code will be by reference to "Section ____" or "§ ____."

2

trying to protect the children from Clay's drug usage. The children were placed with E.S.'s sister. This placement lasted for approximately one month, when the sister returned the children to the Department stating she could not continue to take care of the children due to their special needs.

Despite stating she was not using drugs, on November 6, 2014, E.S. was administered a drug test and tested positive for amphetamine, methamphetamine, and marijuana. Further, E.S. admitted to Trim that she had used drugs while caring for the children and that Clay had also used drugs in the presence of the children. The daughter, M.M.S., was administered a hair follicle drug test on November 5, 2014, and the test was positive for methamphetamine. As a result of E.S.'s continued use of drugs, the Department then filed this petition seeking termination on December 30, 2014.

During the trial, the evidence showed that E.S. had a long-standing addiction to drugs. Specifically, E.S. admitted that she had been addicted to methamphetamine for years. E.S. had two arrests for drug-related offenses in 2004. Her first arrest that year was for delivery of methamphetamine in July of 2004, followed by an arrest for possession of the same drug in December 2004. She was placed on deferred adjudication in 2005; however, her deferred adjudication was adjudicated, and E.S. was sentenced to serve five years in prison. According to her testimony, E.S. used methamphetamine on an almost daily basis between 2004 and 2006 before being sent to prison.

E.S. was released from prison on parole in October 2008. At that time, E.S. began living with N.S., the father of the children. N.S. testified that he and E.S. used

methamphetamine on a regular basis when they were together. This usage included the period of time after they had the children of the marriage.

M.M.S. was born on May 23, 2009, prematurely. She has suffered from difficulties breathing since birth. M.M.S. has been in an early childhood intervention program since shortly after her birth. M.M.S. has significant developmental delay issues and has been diagnosed as mildly retarded. C.E.S. was born July 1, 2011. Since early on, he has demonstrated significant issues regarding anger management.

E.S. admitted that she began using methamphetamine intermittently after M.M.S. was born. E.S. was arrested for possession of marijuana and a parole warrant in 2010. As a result of this arrest, E.S. spent seventy-seven days in jail. In 2012, E.S. was contacted by the Department regarding a report that she was using methamphetamine. E.S. was scheduled for a drug test but failed to appear. Instead, E.S. took the children to Oklahoma. E.S. testified she fled to Oklahoma with the children because she knew she could not pass the drug test.

While E.S. was living in Oklahoma with the children, they were removed from her care due to allegations relating to drug usage and because of her open case in Texas. E.S. testified that she completed her service plan in Oklahoma and the children were returned to her possession on a trial basis in August 2013 and fully in December 2013. The Oklahoma case was dismissed in February 2014. Yet, within two weeks after returning to Texas, E.S. was arrested for possession of a controlled substance. E.S. admitted that she returned to using methamphetamine after returning to Texas.

In June or July of 2014, E.S. became involved with Clay. E.S. admitted that Clay was a methamphetamine user. She further admitted that she did use

4

methamphetamine with Clay while the children were living in the home with them. Clay was the boyfriend who assaulted E.S. in the presence of the children in October of 2014.

During the trial, a significant part of the testimony dealt with the medical problems faced by M.M.S. M.M.S. has had issues with her lungs since her birth. Lori Williams, the nurse at the elementary school where M.M.S. attended, testified that on October 17, 2014, M.M.S. came to school and appeared to be "really sick." According to Williams, M.M.S. was suffering from increased respiration rate and increased heart rate. Williams attempted to contact E.S., but the phone number she had for E.S. was not a working number. The child's teacher's aide rode home on the bus with M.M.S. The following Monday, Williams again noticed that M.M.S. appeared to be sicker. Williams again attempted to contact E.S. to no avail. Williams finally left a voicemail message with M.M.S.'s grandmother. On that Monday, Williams concluded that M.M.S.'s oxygen level was too low and she appeared to be panting and struggling to breath. Williams consulted a nurse practitioner at a nearby clinic and, based on that discussion, called an ambulance to take M.M.S. to the hospital.

Because Williams could not contact E.S., she contacted the sheriff's office and asked that they try to locate E.S. While in the ambulance, M.M.S. was given oxygen, steroid shots, and breathing treatments. At the hospital, M.M.S. was diagnosed with an upper respiratory infection.

E.S. arrived at the hospital approximately thirty minutes after M.M.S. While talking to E.S., Williams attempted to get current contact information for her, to include an address and working phone number. E.S. declined to give Williams the information

stating that she had active warrants and did not want to give that information out. Williams testified that E.S. did not seem to be appropriately concerned with M.M.S.'s welfare. Upon M.M.S.'s discharge from the hospital, E.S. was advised to make sure that M.M.S. receive her breathing treatments at home in addition to those that would be given to her at the school. After M.M.S. continued to come to school suffering from apparent breathing difficulty, Williams contacted the Department over her concerns that M.M.S. was not receiving her breathing treatments at home.

When E.S. was arrested during the domestic assault investigation, Williams was asked to care for C.E.S. while E.S. was in jail. Williams agreed to keep C.E.S. for a week under the Department's safety plan while E.S. was in jail. However, although E.S. had agreed to contact the Department when she was released from jail, she failed to do so. The investigator for the Department, Trim, eventually tracked E.S. down at a leather shop. All E.S. could say regarding her failure to contact the Department when she was released from jail was that it was just bad judgment on her part. E.S. admitted during her testimony that, during this time, she continued to use methamphetamine while caring for M.M.S.

The testimony at trial revealed that E.S. had agreed to a service plan of various steps necessary for her to regain possession of her children. Initially, E.S. signed the service plan on February 11, 2015. After a new caseworker had been assigned the case, E.S. again reviewed the service plan with her new caseworker, Cristin Davis. Davis testified that E.S. had failed to complete the required psychological evaluation, did not follow through with inpatient treatment as recommended by the OSAR[4] evaluation, and failed to remain drug-free. E.S. testified that she did not maintain a

---

[4] Outreach, Screening, Assessment, and Referral Center.

drug-free lifestyle. As to the psychological testing requirement, E.S. testified she scheduled an appointment for the evaluation but was arrested the day before the appointment. Although not mentioned in Davis's testimony, E.S. admitted that she had not maintained any employment prior to being incarcerated.

At the time of trial, the district attorney where E.S. resided revealed that E.S. had pending charges for possession of a controlled substance and tampering with evidence that arose from an arrest in February 2014. Also pending at the date of trial was another possession of a controlled substance charge that arose in February 2015, and a pending indictment for credit card abuse that also arose in February 2015.

After hearing the evidence, the trial court entered a final order in suit affecting parent-child relationship that terminated E.S.'s parental rights on the following grounds:

1. Knowingly placing or knowingly allowing the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

2. Engaging in conduct or knowingly placing the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children;

3. Failing to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children;

4. Using a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the children.

*See* § 161.001(b)(1)(D), (E), (O), (P) (West Supp. 2016). Additionally, the trial court found that termination of E.S.'s parental rights was in the best interest of the children. § 161.001(b)(2).

E.S. does not challenge the trial court's finding regarding the four predicate acts; therefore, we will treat those acts as conceded by E.S. Instead, E.S. only challenges the legal and factual sufficiency of the evidence to sustain the trial court's decision that termination was in the best interest of the children. We disagree with E.S. and will affirm the trial court's judgment.

Standard of Review

The natural right existing between parents and their children is of constitutional dimensions. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). A decree terminating this natural right is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child except for the child's right to inherit. *Holick*, 685 S.W.2d at 20. That being so, we are required to strictly scrutinize termination proceedings. *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980). However, parental rights are not absolute, and the emotional and physical interests of a child must not be sacrificed merely to preserve those rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

The Texas Family Code permits a court to terminate the parent-child relationship if the petitioner establishes both (1) one or more acts or omissions enumerated under Section 161.001(b)(1), and (2) that termination of the parent-child relationship is in the best interest of the child. § 161.001(b). Though evidence may be relevant to both elements, each element must be proved, and proof of one does not relieve the burden of proving the other. *See In re C.H.*, 89 S.W.3d at 28. While both a statutory ground and best interest of the child must be proved, only one statutory ground is required to

8

terminate parental rights under Section 161.001(b). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Therefore, we will affirm the trial court's judgment of termination if legally and factually sufficient evidence supports any one of the grounds found in the judgment, provided the record shows that it was also in the best interest of the child for the parent's rights to be terminated. *See id.*

Due process requires the application of the clear and convincing standard of proof in cases involving involuntary termination of parental rights. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see* § 161.206(a) (West 2014). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007 (West 2014). This standard, which focuses on whether a reasonable jury could form a firm belief or conviction, retains the deference a reviewing court must have for the factfinder's role. *In re C.H.,* 89 S.W.3d at 26.

When we employ the clear and convincing evidence standard, we are not saying that the evidence must negate all reasonable doubt or that the evidence is required to be uncontroverted. *See In re R.D.S.,* 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). We may not substitute our judgment for that of the factfinder; rather, we must still provide due deference to the decision of the factfinder. *See In re A.B.,* 437 S.W.3d 498, 503 (Tex. 2014). The factfinder is the sole arbiter when making determinations regarding the credibility and demeanor of the witnesses. *See id.*

When reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the

finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established. *See In re J.F.C.,* 96 S.W.3d at 265–66. "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* at 266. In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a judgment of termination, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.,* 89 S.W.3d at 25. In conducting this review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *See In re J.F.C.,* 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

Analysis

We begin our analysis with the reminder that E.S. has not appealed the finding of the trial court regarding any of the statutory predicate acts. This being said, we are mindful that evidence proving one or more of the statutory predicate grounds for

termination can also be probative evidence that termination is in the best interest of the children. *See In re C.H.,* 89 S.W.3d at 28.

Turning to the evidence, we note that, by E.S.'s admissions during testimony, the following are true:

1. E.S.continued to use methamphetamine during the pendency of the suit to terminate her parental rights.

2. She was incarcerated at the time of her trial.

3. She was facing further charges at the time of the trial.

4. She had been the victim of a domestic assault from her boyfriend, Clay, yet began seeing him again after she was released from jail.

5. She did not complete the service plan as agreed with the Department.

6. She did not have any definite plans for the children if she was sentenced to further incarceration on any of the pending charges.

7. She had failed to properly supervise M.M.S.'s medical treatment for M.M.S.'s chronic lung issues.

8. She failed to pick the children up after she was released from jail.

9. When not incarcerated during the pendency of the termination proceeding, she was not gainfully employed.

We will use these factual matters in addressing the *Holley* factors to determine whether termination is in the best interest of the children. *See Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976).

The Texas Supreme Court outlined a non-exhaustive set of factors to be used in determining whether termination of the parent child relationship was in the best interest of the children. *See id.* The factors are as follows: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parenting

11

abilities of the parent seeking custody; (5) the programs available to assist the parent; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions committed by the parent. *See id.*; *see also In re D.S.,* 333 S.W.3d 379, 383–84 (Tex. App.—Amarillo 2011, no pet.). In applying the *Holley* factors, "a trier of fact may measure a parent's future conduct by his or her past conduct." *In re D.S.* 333 S.W.3d at 384. The evidence need not establish proof that all of the *Holley* factors support the conclusion that termination is in the best interest of the children and the absence of evidence about some factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in the children's best interest. *See In re C.H.,* 89 S.W.3d at 27.

The finding that E.S. has knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children and engaging in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children supports the proposition that termination of the parent-child relationship is in the best interest of the children under the second and third *Holley* factors. To this we add the testimony of E.S. that she continued to use methamphetamine during the pendency of this suit and that she, in fact, used methamphetamine around M.M.S. That M.M.S. tested positive for methamphetamine is further proof of the endangerment of the children. Thus, the second and third *Holley* factors strongly support the termination of the parental rights.

Throughout the pendency of this matter E.S. has either been incarcerated or moving from location to location. The record reflects that, since the Department took possession of the children, E.S. has either been incarcerated or unemployed. E.S. has lived with Clay during the pendency of the suit when she knew he was a methamphetamine user. Clay committed an act of domestic violence against E.S., yet after she made a complaint against him for this domestic violence, E.S. again began living with him. This evidence supports the trial court's decision to terminate the parental rights under the fourth *Holley* factor, that is, the parental abilities of the parent seeking custody.

As to the stability of the home of the parent seeking custody, the seventh *Holley* factor, the evidence at the trial was that E.S. had a proposal to move the children to Boyd, Texas, where E.S. believed she had employment or to go to a half-way house in Amarillo, Texas. The problem with E.S.'s plans are multiple. First, no one associated with the proposed move to Boyd, Texas, testified that such a move was actually a realistic alternative. Second, if E.S. went to the half-way house in Amarillo, the children, according to E.S.'s own testimony, could not live there. Finally, her proposals completely failed to account for the fact that E.S. had additional charges pending against her that had not been disposed of. E.S.'s solution for this was for the Department to continue with managing conservatorship until such time as she could get these pending matters resolved. No evidence was adduced as to how long this would be.

On the other side of this equation was the testimony of the Department that the children were in a foster care situation that specialized in special needs children.

Although there was no testimony that these foster parents were going to adopt the children, such an alternative was still under consideration. Regardless, the children were currently receiving the type of care that addressed their specialized needs. This factor also supports the trial court's decision that termination was in the best interest of the children.

As to the eighth *Holley* factor, the acts or omissions of the parent that indicate that the current parent-child relationship is not in the children's best interest, the record speaks for itself: continued use of methamphetamine, lack of judgment to protect the children, pending criminal cases, and incarceration through most of the time the case was pending. These acts and omissions support the trial court's finding that termination is in the best interest of these children.

In the final analysis, based upon the record before the Court, when we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established, the evidence is legally sufficient to support the trial court's judgment. *See In re J.F.C.*, 96 S.W.3d at 265–66. Accordingly, the evidence is legally sufficient and we overrule E.S.'s contention to the contrary.

When we review the evidence for factual sufficiency, that is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations, we conclude that the evidence supports the trial court's determination. *See In re C.H.,* 89 S.W.3d at 25. Accordingly, we find the evidence sufficient to support the judgment of the trial court and we overrule E.S.'s contention to the contrary.

We are mindful that E.S. presented testimony about the steps she had taken to become a better parent. E.S. presented a number of different certificates for courses that she had completed while incarcerated that dealt with making better decisions, how to deal with drug addiction, and how to be a better parent. While she is commended for her efforts, the fact that she has demonstrated a recent effort and, possibly, has, in fact, had a recent turn-around in her behavior does not totally offset her past behavior. *See In re J.J.,* No. 07-13-0017-CV, 2013 Tex. App. LEXIS 11194, at *27 (Tex. App.—Amarillo Aug. 29, 2013, no pet.) (mem. op.). This is especially true under the facts of this case where the evidence shows that E.S. had an earlier conviction yet, when she was released from prison, went back to the same conduct that led to her first incarceration. The trial court was not required to believe that there has been a lasting change in the parent's attitude since her children were removed. *See Pruitt v. D.F.P.S.,* No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *27 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.).

## Conclusion

Having overruled E.S.'s issues regarding the legal and factual sufficiency of the evidence to support the trial court's best interest determination, we affirm the order of the trial court terminating her parental rights to the children.


Mackey K. Hancock
Justice

15