**In the Interest of R.D.S., A Minor Child.**

**No. 07–94–0275–CV.**

Court of Appeals of Texas, Amarillo.

June 29, 1995.

Law Offices of Gene Thompson, Gene Thompson, Pampa, for appellant.

Law Offices of Todd L. Alvey, Todd L. Alvey, Pampa, for appellees.

Law Offices of Mike Warner, Mike Warner, Pampa, for the Father.

Law Offices of Richard J. Roach, Richard J. Roach, Miami, for intervenors.

Law Offices of Rick J. Harris, Rick J. Harris, Pampa, for the Child.

Before REYNOLDS, C.J., and DODSON and QUINN, JJ.

QUINN, Justice.

### POINT OF ERROR

In her sole point of error, Heather Swick (Heather) complains of the trial court's refusal to abide by *Swinney v. Mosher*, 830 S.W.2d 187 (Tex.App.—Fort Worth 1992, writ denied) in terminating her parental rights *vis-a-vis* her biological son. She further attacks the sufficiency of the evidence underlying that determination.[1] We find the point unfounded, overrule it, and affirm the judgment.

1. Jeremy Juengel, the biological father of R.D.S., did not appeal.

## STANDARD OF REVIEW

The trial court terminated the parent/child relationship in accordance with § 15.02(a)(1)(A) of the Texas Family Code. That statute vests the trial judge with power to do so if it concludes that "the parent . . . voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return." *Tex.Fam. Code Ann.* § 15.02(a)(1)(A) (Vernon Supp. 1995). Furthermore, each of the foregoing elements must be shown by clear and convincing evidence. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985).[2] This does not mean that the evidence must negate all reasonable doubt, *In re A.D.E.,* 880 S.W.2d 241, 245 (Tex.App.—Corpus Christi 1994, no writ), but simply that it be enough to produce in the mind of the fact finder a firm conviction or belief that the allegations are true. *In re R.R.F.,* 846 S.W.2d 65, 67 (Tex.App.— Corpus Christi 1992, writ denied); *Williams v. Texas Dept. Human Serv.,* 788 S.W.2d 922, 926 (Tex.App.—Houston [1st Dist.] 1990, no writ).

Nor does the clear and convincing standard alter the rules generally applicable to reviewing factual findings. *See In re A.D.E.,* 880 S.W.2d at 245 (holding that the clear and convincing test does not alter the standard of review against which the sufficiency of the evidence is measured). The appellate court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences. *Ramo, Inc. v. English,* 500 S.W.2d 461, 467 (Tex.1973). The fact finder, as opposed to the reviewing body, also enjoys the right to resolve credibility issues and conflicts within the evidence. *Id.* It may freely choose to believe all, part, or none of the testimony espoused by any particular witness. *Id; In re E.S.M.,* 550 S.W.2d 749, 757 (Tex.Civ. App.—Houston [1st Dist] 1977, writ ref'd n.r.e.) (stating that the judge was entitled to disbelieve the testimony of the biological parent). With these caveats in mind, we proceed to discuss the evidence of record.

## EVIDENCE

In ordering termination, the trial court found "by clear and convincing evidence that Jeremy Juengel [and Heather] . . . voluntarily left the child [R.D.S.] alone or in the possession of another not the parent and expressed an intent not to return." It also found "by clear and convincing evidence that termination of the parent-child relationship between Jeremy . . . [Heather] . . . and the child [was] in the best interest of the child." Prior to its arriving at these conclusions, the court heard the following.

Heather and Jeremy, eighteen and seventeen respectively, conceived a child out of wedlock. Though the two had no plans for marriage, they, nevertheless, began to cohabitate with Jeremy's parents and formulate plans to place the unborn child for adoption. The idea to relinquish the baby, according to Heather, emanated from comments made by Jeremy's mother. Apparently she did not care, for one reason or another, to have an additional person living in the house. These comments supposedly influenced Jeremy to pressure Heather to pursue adoption.[3]

The two teenagers, however, were not long for the Juengel household. Within weeks they had moved to live with Crystal Keys. The latter and her mother-in-law soon became aware of the appellant's desire to have someone adopt the baby, and Wanda and Curtis Keys were notified of that. Soon, the two couples met and resolved to pursue the adoption.

In spite of the agreement, Wanda often asked whether the prospective mother was sure of her decision to relinquish the child. She did so to avoid "tak[ing] him home and get[ting] attached to him and [have] her change her mind." The responses to the inquiries were the same. Heather consistently replied that "she wasn't ready to have a baby, she wasn't ready to raise a baby, she

---

**2.** The statute also requires proof that termination was in the best interests of the child. *Tex.Fam. Code Ann.* § 15.02(a)(2) (Vernon Supp.1995). Yet, whether such evidence existed here will not be addressed; Heather did not raise it on appeal.

**3.** The appellant does not contend on appeal that the pressure sufficed to overcome her free will or otherwise render her actions involuntary.

wanted to go back to school, and her [sic] and Jeremy both wanted to go back to school and they wasn't [sic] ready to be parents and that . . . she wanted what was best for the baby." (Emphasis).

More time passed. Then, Heather began to experience labor pains. While at the hospital, the medical staff as well as Wanda attended to her needs. Furthermore, the parties continued to discuss the impending birth and adoption, again resulting in Heather's refusal to retain the infant. Then, on July 27, 1993, R.D.S., a male child, was born.

Next, counsel for the Keys initiated suit, on July 27, 1993, to end the parental rights of Heather and Jeremy and to permit the adoption. Thereafter, he ventured to the hospital to talk with appellant. While at the hospital, both Heather and Jeremy were given, for signature, affidavits relinquishing their respective parental rights. Counsel explained the documents to, at least, Heather and read it aloud to facilitate complete understanding of its content and effect. He next told Heather that though the affidavit purported to be irrevocable for 60 days, she could have three days from July 27, 1993, to change her mind. The biological parents signed the two documents on July 28, 1993.

Once the affidavits were executed and filed of record, the court issued an order, on July 28, 1993, appointing Curtis and Wanda "temporary managing conservators of [R.D.S.]." Pursuant to that directive, the Keys were granted, among other things, all rights, privileges, duties and powers existing between a parent and child, including the right to exclusive care, custody, and control. Next, the Keys went to pick-up their ward from the hospital on July 29th. Upon arriving, they discovered that Heather had been discharged the previous day.

Heather had returned to Crystal's house, leaving the newborn behind for Wanda and Curtis to retrieve. Her mind set at the time, according to Crystal, was not one of concern for the infant. Instead, the teenager worried

more about her appearance and clothes now "that she wasn't fat." That evening Heather and Jeremy grew "sentimental" about their decision, but, the mood soon passed. Thereafter, Heather and Jeremy filled their time "going out, going fishing, [and] just having fun."

Heather, however, contended that she began to regret her decision by July 31st but admitted to telling no one, not even the legal counsel who, at the hospital, allotted the aforementioned grace-period. Furthermore, the girl visited R.D.S. sporadically, so testified Wanda. Heather also admitted that her visits diminished once she and Jeremy found other things to do.[4] Moreover, during this time, the biological mother was heard to say that she "did the right thing" and "didn't even feel like . . . [R.D.S.] was hers."

Approximately six weeks passed before Heather undertook conduct indicative of her supposed intent to remain R.D.S.'s mother. During the middle of September 1993, she had occasion to telephone her parents, Larry and Jackie Swick (Swicks), who live in Tennessee. The complete substance of their conversation was not offered in testimony; a portion, no doubt, dealt with R.D.S. and the pending adoption. Immediately thereafter, the Swicks contacted legal counsel to investigate the likelihood of their obtaining custody of R.D.S. At about this same time Heather told Crystal about her proposed effort to stop the adoption. Crystal responded by asking her two boarders to leave.

On the 22nd of September, the Swicks intervened in the pending termination and adoption action and sued for managing conservatorship. Two days later, Heather and Jeremy executed written revocations of their previous affidavits. Of note, neither biological parent requested custody of their biological son. On the contrary, both asked that the Swicks "be named *permanent* managing conservators." Several days later, Heather and Jeremy left, without R.D.S., for Tennessee to live with the Swicks.

4. Heather attested that her visits initially occurred on a daily basis. Yet Crystal, denied this, as did Wanda. Indeed, the latter remembered only two occasions on which the biological mother saw the infant. The first happened within a week of birth and the second during the Thanksgiving holiday in November of 1993. The trial judge had the prerogative to determine who, if anyone, to believe.

During the remaining days of September, all of October and three weeks of November, the Keys heard nothing from the maternal grandparents or biological parents of their ward. Neither the intervenors, Heather, nor Jeremy made effort to call, write or otherwise communicate with R.D.S. or determine his well-being. None sent gifts or other forms of support. Heather sought to justify her silence by proclaiming that she knew not the address of her child's caretakers, in spite of her "daily" sojourns to that locale. Next, she suggested that the Keys had no phone; however, why calls were not made through a neighboring relative, whose phone number Jeremy possessed, went unexplained.

Nevertheless, the Swicks and Heather returned to Pampa in late November of 1993.[5] The court had scheduled to try the proceeding during Thanksgiving week. Rather than do so, it continued the matter, appointed counsel for Heather, and extended her and the Swicks visitation privileges.[6] After the hearing ended, Heather and the Swicks went to the Keys' home and returned on the following day. During the entire time, which approximated 4 hours and 20 minutes, nothing of moment occurred. The Keys were quite hospitable to the visitors. As the gathering ended on the second day, Heather allegedly approached Wanda and said, "I'm sorry, it's not me."

Next, the three ventured back to Tennessee, not to be heard from or seen until July of 1994. As before, none endeavored to communicate with or contact the Keys or R.D.S. None sent the child Christmas gifts or cards. None sent money to help defray the expenses of raising him. Justifications were once again offered, including the lack of funds.[7]

When the court convened a final hearing on July 5, 1994, Heather appeared with counsel as did the Swicks and Keys. Jeremy,

however, did not. Instead, his attorney tendered a second affidavit wherein the biological father again relinquished his parental rights. Next, various witnesses were called, including Heather. While on the stand, the latter announced, for the first time, her desire to personally gain custody of R.D.S. The "deal," as she put, "was that the baby was to be put into my custody with my parents overseeing that the baby was taken care of properly and to give me financial aid if I was to need it."

## THE SUFFICIENCY OF THE EVIDENCE

■ Again, statute vests the trial judge with authority to end a parent/child relationship if it finds that "the parent ... voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return." *Tex.Fam.Code Ann.* § 15.02(a)(1)(A). There is no specified time frame within which these pivotal indicia must arise. Though some authority suggests that the underlying misconduct may not be too remote in time, *In re R.R.F.*, 846 S.W.2d at 69; *Hendricks v. Curry*, 401 S.W.2d 796, 800 (Tex.1966), it is certain that it need not immediately precede the final hearing. *Curton v. Gordon*, 510 S.W.2d 682, 685 (Tex.Civ. App.—Austin 1974, writ ref'd n.r.e.); *Lout v. Whitehead*, 415 S.W.2d 403, 405–406 (Tex. 1967).

■ Furthermore, discontinuing the misconduct does not necessarily prevent the court from acting. *Id.* Once activity within the parameters of § 15.02(a) occurs, a parent's change of heart does not stay the court's hand. The judge may proceed to safeguard the paramount interests of the child. Thus, if the evidence at bar established that Heather voluntarily left her son with someone other than his biological father

---

**5.** By this time, Jeremy and Heather had ended their relationship resulting in Jeremy leaving Tennessee. The record suggests that he may have gone to Michigan.

**6.** Save for one instance when Wanda and Crystal became involved in a fight and Wanda stated that Heather was unwelcome so long as she associated with Crystal, little indicated that the Keys prohibited anyone from visiting the baby.

**7.** Heather renewed her assertion that she had no money, though she had obtained a job in April of 1994 and saved approximately $300. Mr. Swick, in turn, uttered that he made no effort to see his grandson because he felt uncomfortable with the Keys. Furthermore, he hoped to avoid conflict with them, even though no evidence of the likelihood of such entanglements was offered.

while expressing an intent not to return, the court was entitled to sever the parent/child relationship, notwithstanding her later attempt to renounce her decision.[8] *See Smith v. McLin*, 632 S.W.2d 390, 391–93 (Tex. App.—Austin 1982, writ ref'd n.r.e.) (so holding); *Diaz v. Beyer*, 611 S.W.2d 726, 730–32 (Tex.Civ.App.—Waco 1981, writ ref'd n.r.e.) *cert. denied*, 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed.2d 160 (1982) (so holding). And, we conclude that it did.

■ In executing her affidavit of voluntary relinquishment, the trial court was free to interpret Heather's act an overt manifestation of her present intent to permanently leave her child. *Smith v. McLin*, 632 S.W.2d at 392 (considering a defective affidavit, though unenforceable, as probative evidence of intent to "not return"); *Diaz v. Beyer*, 611 S.W.2d at 730–31 (considering a revoked affidavit as probative evidence of the same intent). So too was it free to construe her act of leaving the boy behind at the hospital as like intent. The latter, in the eyes of the trial court, could have been further exemplified by her directive to grant the Swicks custody, by the substance of her apology to Wanda during the Thanksgiving visit, by her statement that she was not ready for children, by the repeated assurances that she wanted the Keys to have the baby, and by her comments that she made the correct decision and felt as if she had never had a child.

Indeed, her ultimate demand at trial could also be viewed as, and is, consistent with an intent to eschew parental obligation. Though Heather portended to claim custody, she actually made a "deal" to have the Swicks "oversee" the needs, care, and financial welfare of R.D.S. At the very least, the trial judge was free to so reasonably infer.

■ That Heather paid none of the medical expenses related to the child's birth nor provided R.D.S. with any financial support, especially *after* she secured employment, was also probative. *Diaz v. Beyer*, 611 S.W.2d at 730–31 (considering such as pertinent evidence). Each parent has a duty to support his or her offspring even though not ordered to do so by the court. *Tex.Fam.Code Ann.* § 4.02 (Vernon 1993); *In re A.D.E.*, 880 S.W.2d at 245–46; *Curton v. Gordon*, 510 S.W.2d 682, 685 (Tex.Civ.App.—Austin 1974, writ ref'd n.r.e.). Indeed, it seems somewhat inconsistent for a parent to protest the termination of the parent/child relationship while concurrently disavowing any duty to support the child.

The sparse effort of Heather to visit, to communicate with R.D.S., or to contact someone about his well-being, provided additional basis for the court inferring an intent to permanently stay away. Indeed, finding it not "quite convenient, moneywise or situationwise" to see or communicate with one's offspring, as did Heather, is hardly indicative of an intent to pursue the parental relationship. *Curton v. Gordon*, 510 S.W.2d at 686.

Even evidence of a less tangible, yet equally probative nature existed upon which the trial judge could have relied. For example, though Heather professed to immediately regret her decision, she said nothing for many weeks. When she finally did speak, her utterances coincided with her call to the Swicks in mid-September and their intervention. From this, one could infer that Heather acted to placate the wants of her parents rather than pursue her obligations as a mother. Should one add to this milieu Heather's apology to Wanda, the inference becomes quite reasonable. Given this evidence and the leeway extended to the fact finder in resolving credibility issues and weighing testimony, we cannot hold that the requisite finding of intent lacked clear and convincing evidentiary basis.

With regard to that element of § 15.02(a)(1)(A) pertaining to the familial relationship of the individuals with whom the child was left, the evidence was undisputed. Wanda and Curtis Keys were not the biological or adoptive parents of R.D.S. when Heather left him behind. Thus, the elements

---

8. This is not to say that termination will necessarily result. Indicia such as best interests of the child or the remoteness of the conduct, for instance, may compel a different outcome. However, those extraneous factors are irrelevant here since the sole point of error, as discussed in appellant's brief, mentions nothing of them.

of § 15.02(a)(1)(A) had the requisite factual support.

## SWINNEY V. MOSHER

In spite of the sufficiency of the evidence, Heather contends that the lower court erred in failing to abide by *Swinney v. Mosher*. She construes that decision as prohibiting the use of a revoked affidavit as evidence of intent to "abandon." So too does *Swinney* allegedly deny probative weight to any act taken in pursuance of an adoption. Indeed, in her view one cannot abandon a child whose placement for adoption emanates from a desire to help the child. Both her reliance on *Swinney* and her arguments are misplaced, however.

First, the facts in *Swinney* are quite different from those at bar. Admittedly, Ms. Swinney executed an affidavit relinquishing all parental interest in her child whom she delivered to the prospective adoptive parents. Yet, unlike Heather, Ms. Swinney overtly recanted the following day. *Swinney v. Mosher*, 830 S.W.2d at 190–91. Heather waited almost two months to speak out, and when she did, she demanded that custody not be awarded to her but to another couple. Ms. Swinney also answered and cross-petitioned within weeks after publicly disclosing her changed intent. *Id.* Heather neglected to answer for approximately five months and never formally pled to regain custody. Additionally, the *Swinney* opinion mentioned nothing of the biological mother leaving town or foregoing visitation or remaining incommunicado, unlike the record here. Indeed, the evidence which the Moshers presented to establish "abandonment" was nothing more than the biological mother's execution of the affidavit and delivery of the child. *Id.*, 830 S.W.2d at 191. Here, there is much more, as previously described.

Second, the *Swinney* panel relied heavily on *Hendricks v. Curry*, 401 S.W.2d 796 (Tex. 1966) in concluding that effort to place a child for adoption cannot evince intent to "abandon." *Swinney v. Mosher*, 830 S.W.2d at 191. *Hendricks* involved the question of whether " 'abandonment' within the meaning of Article 2330 [of the Texas Revised Civil Statutes] can be found as a fact from execution by a parent of a written consent to adoption and delivery of possession of the child . . . ." In defining "abandonment," the *Hendricks* court adopted the meaning given the phrase "abandon and desert" in article 46a, § 6 of the Texas Revised Civil Statutes.[9] It further noted that the latter required a " . . . wilful act or course of conduct, . . . such as would imply a conscious disregard or indifference to such child in respect to the parental obligation that the parent owes to such child." *Hendricks v. Curry*, 401 S.W.2d at 801, *quoting*, *Strode v. Silverman*, 209 S.W.2d 415 (Tex.Civ.App.—Waco 1948, writ ref'd n.r.e.). From this, the court extrapolated that a parent who places a child for adoption with the intent to better the child does not act in a manner consciously disregarding parental duties owed to the child. *Id.* at 801.

Yet, since the advent of *Hendricks*, the state legislature met and repealed both articles 2330 and 46a, § 6. The successor provision here applicable, that is, § 15.02(a)(1)(A) of the Family Code, dropped the nebulous term "abandonment." In its stead, the lawmakers substituted plain and precise elements describing specific acts and a particular *mens rea*. Furthermore, the *mens rea* described is simply an intent not to return, not the reprehensible motive implicit in the "conscious disregard or indifference" standard.

The legislature having so clearly spoken we are chary, unlike the *Swinney* court, to

9. Article 2330 stated in pertinent part that "[t]he term 'dependant child' or 'neglected child' includes any child under 18 years of age who is dependent upon the public for support or who is destitute, homeless or abandoned . . . ." It was repealed in 1974 and replaced by § 15.02 of the Texas Family Code. Article 46a stated in pertinent part that

no adoption shall be permitted except with the written consent of the living parents of the

child; provided, however, that if a living parent or parents shall voluntarily abandon and desert a child sought to be adopted, for a period of two . . . years, and shall have left such child to the care, custody, control and management of other persons . . . it shall not be necessary to obtain the written consent . . . ."

This provision was similarly repealed and replaced.

supplement the statute with elements judicially created and applicable to a repealed law. "[T]he Legislature is *constitutionally entitled* to expect that the Judiciary will faithfully follow the specific test that was adopted." *Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim.App.1991) (emphasis in original). We propose to abide by that constitutional expectation and forego holding that the benevolence of a parent's motivation in permanently leaving an infant behind removes the conduct from the teeth of § 15.02(a)(1)(A).

Nor are we ready to say that revoking an affidavit of voluntary relinquishment under § 15.03 of the Family Code *per se* strips the document of all probative value. If the parent truly intended to "not return" when it signed the affidavit, the fact that the parent *had* that intent is frozen. Rescinding the document simply evinces a changed mind. It does not have the effect of creating a time gate through which the parent may travel back and erase established fact. The affidavit remains indicative of the preexisting intent. Moreover, when tied to conduct such as that exemplified by Heather at bar, the totality of the evidence may well be enough to support the *involuntary* termination of parental rights. Indeed, even the *Swinney* court, in an earlier decision, held as much. *Broyles v. Ashworth*, 782 S.W.2d 31, 34 (Tex. App.—Fort Worth 1989, no writ).

### EPILOGUE

Strong are the bonds between a child and parent, and governmental interference therewith is loathed. Yet, at times, interference must occur to protect a child when authorized by law. The trial court determined this cause was one such instance. In view of the disputed testimony and the applicable standard of review, we cannot say that it erred.

Accordingly, the judgment is affirmed.