

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-25-00092-CV

IN THE INTEREST OF H.M.L. AND D.J.C., CHILDREN

On Appeal from the 64th District Court
Swisher County, Texas
Trial Court No. A-13244-22-10, Honorable Kregg Hukill, Presiding by Assignment

July 30, 2025

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and YARBROUGH, JJ.

Appellant, Mother, appeals from an order terminating her parental rights to her children, H.M.L. and D.J.C., in a suit brought by Appellee, the Texas Department of Family and Protective Services.[1]  Mother challenges the sufficiency of the evidence to support the trial court's findings under the predicate grounds and the finding that termination is in the best interest of the children.  We affirm the trial court's judgment of termination.

---

[1] To protect the privacy of the parties involved, we refer to the children singularly by their initials and collectively as "children," while referring to family members by their relationship to the children.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b).

BACKGROUND

The children the subject of this suit are thirteen-year-old H.M.L. and nine-year-old D.J.C. The father of H.M.L. is D.L.[2] The father of D.J.C. is deceased. The referring court conducted a de novo hearing on December 10, 11, and 12, 2024.[3] The following evidence was presented in the case.

Since 2014, Mother and the children have been the subject of multiple Department investigations. In 2014, the Department investigated allegations of domestic violence by D.J.C.'s father and Mother's use of methamphetamine during her pregnancy with D.J.C. This case was closed in 2015 after Mother completed family-based safety services. In early 2016, the Department conducted an investigation related to allegations of sexual abuse of H.M.L. and Mother's attempted suicide and drug use. The children were placed with Maternal Grandmother until Mother completed Department services and a drug treatment program in Ohio in October of 2016. In 2020, the Department removed the children from Mother's care because of her drug use. D.J.C. was placed with Maternal Grandmother and H.M.L. lived with her father. In August of 2021, the children were returned to Mother's care despite Maternal Grandmother's ongoing concerns about Mother's ability to stay sober. In March of 2022, the Department opened an investigation related to Mother's methamphetamine use and mental health.[4]

---

[2] D.L.'s parental rights were terminated in this proceeding, and he does not appeal.

[3] The final hearing before the Associate Judge was held on March 22, August 9, August 23, and September 5, 2024.

[4] The case was closed with the designation "alternative resolution."

On September 28, 2022, the Department received an intake alleging concerns about Mother. The intake alleged that Mother was accusing the school of altering her children's birth certificates and Social Security cards. A second intake received on the same date alleged Mother abused methamphetamine two to three times a week and was "schizophrenic crazy." Initially, Mother was uncooperative. She refused to speak to the investigator or allow the investigator to see the children. On October 1, Mother texted the investigator and told the investigator that she should not be raising children and to come and get them. When the investigator contacted Mother, she denied making the statements. Maternal Grandmother told the investigator that she was afraid for the children's safety because Mother becomes "really crazy" and violent when she uses methamphetamine. The Department received a third intake on October 8, alleging that Mother was paranoid and appeared to be under the influence of methamphetamine. She did not believe her children were actually her children, because of physical changes in their facial features. During the initial interview with the investigator on October 11, Mother told the investigator that H.M.L. and D.J.C. were not her children. According to Mother, Maternal Grandmother took the children to the store, and they were "switched." Mother showed the investigator photographs of the children and pointed out that their facial features and eye colors were not the same as they had been. Mother also told the investigator that her ex-husband "was not really deceased" and that her current boyfriend was no longer in the home because he could not handle her personalities.

The Department filed its petition for protection, conservatorship, and termination of parental rights and the children were removed from Mother's care. Mother admitted that her mental health was affecting her parenting abilities, and she was not "mentally

3

safe." She did not contest the adversary hearing. The children were placed with Maternal Grandmother.

The Department developed a service plan for Mother and the trial court ordered compliance with the plan's requirements. Among other things, the plan required Mother to obtain/maintain an appropriate residence for six months; allow monthly announced/unannounced access to the residence by the caseworker; attend supervised visits and follow visitation rules; maintain a drug-free lifestyle and refrain from the use of illegal drugs; submit to random drug testing; complete a mental health assessment and psychiatric evaluation; sign a release of information from service providers; complete individual counseling and family therapy; and meet a caseworker face-to-face monthly.

Mother was diagnosed with major depressive disorder when she was discharged from the Army in 2010. In 2015, she was diagnosed with post-traumatic stress disorder (PTSD). She receives disability payments in the amount of $4,369 per month through the V.A. Mother divorced Kenneth Collin a few months after the children were removed. According to Mother, she was in an active methamphetamine addiction at the time, and she was not taking her prescribed medication. Mother was last employed as a healthcare assistant in 2020.

Between November of 2022 and February of 2024, Mother declined to participate in most of the Department's required services. She refused to submit to drug testing on November 11 and 30, and December 8, 2022; and on February 10 and 16, 2023. In March of 2023, Mother attempted suicide and was admitted to The Pavilion in Amarillo, a mental health treatment center. After her release, Mother was scheduled to attend an

4

inpatient V.A. program for substance abuse in Bonham and was twice approved to attend the RISE (Recovery in Supportive Environment) program at the V.A. Medical Center in Waco, but she decided not to participate in either program.

The Department stopped the in-person visits and telephone contact between Mother and the children due to Mother's behavior and instability. She questioned whether the children were really her children and kept asking the children who they were. Between May of 2023 and July of 2024, Mother did not allow the caseworker access to her home. In lieu of face-to-face contact, the caseworker contacted Mother through monthly letters.

Mother was arrested in July of 2023 for unauthorized use of a motor vehicle and spent four days in jail. In February of 2024, Mother was arrested again and incarcerated in the Swisher County Jail for 45 days. She was charged with resisting arrest, possession of a controlled substance, and bringing a controlled substance into a jail facility. Mother pleaded guilty to unauthorized use of a motor vehicle and received deferred adjudication supervision for 12 months. One of the conditions of her supervision was that she complete the V.A.L.O.R. program in McKinney.[5] She completed the following services while incarcerated: alcohol and drug education, untangling relationships, financial management, aftercare and discharge planning, seeking safety, recovery support meetings, mindfulness and meditation, anger management, substance abuse evaluation, job readiness skills, wellness and recovery life skills, parenting, and individual counseling.

---

[5] V.A.L.O.R. is an in-custody facility that offers drug treatment and rehabilitation for veteran offenders. Mother participated in the V.A.L.O.R. program from March 28 to July 26, 2024.

At the time of the final hearing in August of 2024, Mother had been released from custody and lived with Maternal Grandmother in Tulia. She was participating in a 90-day Intensive Outpatient Program (IOP) for PTSD and substance abuse. She resumed supervised visitation with the children. According to Mother, she has been sober since February 13, 2024. She is taking care of her mental health by continuing counseling at the V.A. and taking her prescribed medication. Mother renewed her relationship with Kenneth during her incarceration. Mother plans to enroll in Amarillo College, obtain her CDL, and get a local driving job. If the children are returned, she will keep them in their schools in Plainview to avoid another adjustment period.

Within a week after the conclusion of the final hearing, Mother and Maternal Grandmother argued, and Maternal Grandmother told Mother to get out of her home. By October, Mother had relocated to Greenville with Kenneth, six hours away from the children. According to Mother she has a large support system in Greenville—a long-time friend Stacey, Stacey's husband, and Stacey's adult children. Mother has a two-bedroom apartment and plans to relocate the children to Greenville. Mother did not participate in IOP after she moved to Greenville.

Mother has had an "off-and-on" relationship with Kenneth since 2015. He has had a drug problem since 2006 and has used methamphetamine with Mother. In 2012, Kenneth was convicted of organized crime (selling drugs) and sentenced to ten years in prison. He served two and a half years of his sentence and completed his parole in 2022. In April of 2024, Kenneth was arrested for two misdemeanors: theft of property and resisting arrest. He pleaded guilty to the charges and received probation. Kenneth describes himself as a father figure to H.M.L. and D.J.C. although he currently does not

6

have a relationship with them. He admits that in the past, he and Mother were "high" around the children and that the children were not safe. He claimed he has been clean since April of 2024. He is not participating in any counseling or A.A. or N.A. He and Mother plan to remarry.

After a hearing, the children were removed from their placement with Maternal Grandmother in March of 2023 because of concerns for the children's mental health. The children were placed in a foster home in Plainview. Dr. Cassondra Collins provided individual therapy for the children, including therapeutic visitation between the children and Mother and the children and Maternal Grandmother. Initially, the counseling focused on helping the children adjust to a change in their placement and establishing healthy boundaries in their relationship with Mother and Maternal Grandmother. Collins observed child abuse indicators in both children. H.M.L. experienced sexual abuse from two people while in Mother's care and reported an incident where Maternal Grandmother threw a cell phone and hit H.M.L. in the face. Both children witnessed Mother using drugs and recounted instances prior and subsequent to the removal when Mother acted unpredictably and did not recognize that H.M.L. and D.J.C. were her children. This caused the children to feel scared and unsafe. Mother and the children resumed telephone visits after Mother was incarcerated and transferred to McKinney.

The foster mother has known the children their entire lives. In 2020, the children stayed with the foster mother while Mother worked her plan of service in another case. The children are thriving in their current placement. H.M.L. is an eighth grader and loves going to church. She participates in golf and enjoys swimming. D.J.C. is an energetic fourth grader. She loves to swim and play outside. Both children remain in counselling

to address adjustment disorder, anxiety, and depression. The children are bonded with each other. The foster parents plan to adopt the children if Mother's parental rights are terminated.

After the de novo hearing, the trial court terminated Mother's parental rights to H.M.L. and D.J.C. on the grounds of endangering conditions, endangerment, and failure to comply with a court order that established actions necessary to obtain return of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O).[6] The trial court also found that termination was in the best interest of the children. *See* § 161.001(b)(2). The Department was appointed the permanent managing conservator of H.M.L. and D.J.C. Mother timely appealed the resulting judgment.

## STANDARD OF REVIEW

When reviewing the legal sufficiency of the evidence in a termination case, the appellate court should look at all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id*. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible, but we do not disregard undisputed facts. *Id.* Even evidence that does more than raise surmise or suspicion is not sufficient unless that

[6] Further references to provisions of the Texas Family Code will be by reference to "section ___" or "§ ___."

evidence can produce a firm belief or conviction that the allegation is true. *In re K.M.L.*, 443 S.W.3d 101, 113 (Tex. 2014). If, after conducting a legal sufficiency review, we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven was true, then the evidence is legally insufficient and we must reverse. *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266).

In a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *Id.* We must also consider whether disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* If, considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## APPLICABLE LAW

A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to

9

accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *See id*.

In a case to terminate parental rights under section 161.001 of the Family Code, the petitioner must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.C.B.*, 280 S.W.3d 888, 894 (Tex. App.—Amarillo 2009, pet. denied). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362. We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights if the evidence also establishes that termination is in the child's best interest. *In re K.C.B.*, 280 S.W.3d at 894–95.

The clear and convincing evidence standard does not mean the evidence must negate all reasonable doubt or that the evidence must be uncontroverted. *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). The reviewing court must recall

that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences. *Id.* The factfinder also enjoys the right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of the testimony espoused by any witness. *Id.* Where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive. *In re B.R.*, 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ).

The appellate court cannot weigh witness credibility issues that depend on demeanor and appearance as the witnesses are not present. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam). Even when credibility issues are reflected in the written transcript, the appellate court must defer to the factfinder's determinations, if those determinations are not themselves unreasonable. *Id.*

Sufficiency of the Evidence Under Subsections 161.001(b)(1)(D) and (E)

In Mother's first, second, and third issue, she challenges the legal and factual sufficiency of the evidence to support termination of her parental rights under subsections 161.001(b)(1)(D) and (E). Mother points to the fifteen-day period between the first and third intakes and contends that her conduct and the children's circumstances did not warrant an immediate removal, so those same conditions are not sufficient to support termination under subsections (D) and (E).

We review the trial court's findings under both subsections (D) and (E) when raised on appeal because of the potential consequences to a parent's parental rights in a future proceeding concerning a different child. *In re N.G.*, 577 S.W.3d 230, 235–37 (Tex. 2019)

11

(per curiam). Because the evidence pertaining to subsections (D) and (E) is interrelated, we may conduct a consolidated review. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

A trial court may order termination of a parent-child relationship if the court finds by clear and convincing evidence that a parent has knowingly placed or knowingly allowed a child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child and/or engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* § 161.001(b)(1)(D), (E). Both subsections (D) and (E) require proof of endangerment. To "endanger" means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *Boyd*, 727 S.W.2d at 533. A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Family & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child suffer injury. *In re N.K.*, 399 S.W.3d 322, 330–31 (Tex. App.—Amarillo 2013, no pet.).

While both subsections (D) and (E) focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the child. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory*

12

*Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied).  Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D).  *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no pet.).  " Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home" under subsection (D).  *In re M.R.J.M.*, 280 S.W.3d at 502.  The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent.  *Id*.  Thus, subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E).  *Doyle*, 16 S.W.3d at 394.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions, but also by the parent's omission or failure to act.  *In re M.J.M.L.*, 31 S.W.3d 347, 350–51 (Tex. App.—San Antonio 2000, pet. denied); *Doyle*, 16 S.W.3d at 395.  To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct.  *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).  Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  *In re E.P.C.*, 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.).  The specific danger to the child's well-being need not be established as an independent proposition but may be inferred from parental misconduct.  *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.).  "[A]

13

parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

We begin our analysis by addressing Mother's challenge to the sufficiency of the evidence of her conduct and the children's circumstances during the fifteen-day period between the first and third intakes. She contends that if the Department was not compelled to remove the children immediately from her care, then those same conditions as they existed at the outset are not sufficient for termination. We disagree.

Chapter 262 of the Family Code sets forth the procedures and substantive requirements by which the Department may take possession of a child when necessary to protect that child's health and safety. Under that chapter, the Department is required to make reasonable efforts to prevent or eliminate the need to remove children from their home. § 262.101(a)(6), (b). The Department is charged with conducting a thorough investigation consistent with the circumstances. § 261.301. The Department followed the statutory requirements in this case. The trial court's order of protection was signed the day after the Department's petition and affidavit in support of emergency removal were presented to the court. In its order for protection of a child, the trial court found there was an immediate danger to the physical health or safety of the children; continuation in Mother's home would be contrary to the children's welfare; and reasonable efforts, consistent with the circumstances and providing for the children's safety, were made to prevent or eliminate the need for a removal. Moreover, Mother did not contest the findings in this order; instead, she agreed to the removal. At trial, she testified that, during the time in question, she was not "mentally safe" and was in an active methamphetamine addiction. For purposes of our review of the sufficiency of the evidence to support

14

termination under subsections (D) and (E), we are not limited to this fifteen-day period. The relevant timeframe for evaluating subsection (D) is before the children's removal. *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). The conduct to be examined under subsection (E) includes what the parent did both before and after the children were born because a course of conduct must be established. *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana, 2013 pet. denied).

The evidence showed that Mother has a lengthy history with substance abuse. Mother testified that she first used drugs at the age of twelve. She began using methamphetamine on a daily basis after the birth of D.J.C. The Department has been involved with the children since H.M.L. was three years old and D.J.C. was an infant. Mother has been to rehabilitation programs for substance abuse ten times and has been unable to maintain her sobriety over time. Both children are aware of Mother's drug use although she denied using drugs in the children's presence. She acknowledged her drug use affected the children because her visits and phone calls with the children were terminated. Notably, Mother acknowledged that parenting children while using methamphetamine is dangerous. In determining whether a parent has engaged in a course of conduct endangering a child, we may look at the conduct both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). A parent's ongoing drug abuse is conduct that subjects a child to a life of uncertainty and instability, which endangers the physical and emotional well-being of the child. *See In re A.B.*, 125 S.W.3d 769, 777 (Tex. App.—Texarkana 2003, pet. denied). Additionally, the trial court could have considered Mother's failure to complete significant requirements of her service plan as part of its endangering conduct analysis under subsection (E). *In re*

15

*H.G.*, No. 07-21-00278-CV, 2022 Tex. App. LEXIS 2687, at *20 (Tex. App.—Amarillo Apr. 25, 2022, pet. denied) (mem. op.). "While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) (emphasis in original). Those risks are present here as Mother failed to address her mental health issues resulting in termination of her visits with the children, did not have stable housing, and was incarcerated for unauthorized use of a motor vehicle and drug-related crimes.

A parent's mental state may be considered in determining whether a child is endangered if the mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *In re E.G.*, 643 S.W.3d 236, 252 (Tex. App.—Amarillo 2022, no pet.). Threats or attempts to commit suicide may also contribute to a finding that a parent engaged in endangering conduct. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). The Department produced evidence that Mother has a history of major depressive disorder, PTSD, and multiple suicide attempts. Mother was not taking her prescribed medication, and her mental instability was such that at the time the Department became involved, she questioned her children's identities. She thought her children had been "duplicated." She believed that H.M.L. was an imposter. She denied the children were her biological children and wanted verification that H.M.L. and D.J.C. were hers. These thoughts persisted for months after the children were removed. Mother acknowledged that her mental health was affecting her parenting abilities. The children developed emotional issues requiring ongoing therapy as a result of Mother's instability.

During the pendency of the current case, Mother engaged in criminal activity and was incarcerated twice. Consequently, she lost her home and was unable to attend in-person visits with the children. Evidence of criminal conduct, convictions, and imprisonment and their effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.).

Based on the record and the deference we must pay to the factfinder's determinations related to credibility, the trial court could have found by clear and convincing evidence that Mother endangered H.M.L. and D.J.C., both by her course of conduct and by placing them in an environment that endangered their well-being: struggling with substance abuse issues for the last ten years; continuing to use methamphetamine during the pendency of the case; renewing a close relationship with a known substance abuser; having a history of mental health instability; and engaging in criminal activity resulting in incarceration. As such, we hold that the evidence is both legally and factually sufficient to support the trial court's findings of statutory grounds under subsections (D) and (E). We overrule Mother's first, second, and third issues.

Having found that the evidence is legally and factually sufficient to support the trial court's findings under subsections 161.001(b)(1)(D) and (E), we need not address Mother's fourth issue challenging the trial court's finding under (O). Only one predicate ground is required to support termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362.

Best Interest

In her fifth issue, Mother challenges the factual and legal sufficiency of the evidence to support the best-interest finding made under section 161.001(b)(2). A determination of best interest necessitates a focus on the child, not the parent. *In re B.C.S.*, 479 S.W.3d at 927. Appellate courts examine the entire record to decide what is in the best interest of the child. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[7] "[T]he State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See In re E.C.R.*, 402 S.W.3d at 249. The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *In re N.R.T.*,

---

[7] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.*

338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). We must also bear in mind that a child's need for permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in determining best interest. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

For the past ten years, sobriety and mental stability have been a constant battle for Mother. The trial court heard evidence of Mother's well-documented history with the Department since D.J.C. was an infant and H.M.L. was three years old. It is undisputed that Mother failed to address her mental health concerns and attempted to harm herself while the children were in care. She used methamphetamine for more than a year and failed to take advantage of opportunities for drug treatment and counseling until a few months before trial, demonstrating an unwillingness to ensure the emotional well-being of the children. The possibility of Mother's relapse into drug use and her reestablishing a relationship with Kenneth, a long-time drug abuser, posed a very real danger to the children. Further, during the pendency of the case, Mother failed to submit to drug testing as requested by the Department and waited sixteen months before initiating any services in her plan of service. A trial court is permitted to consider a parent's drug use, inability to provide a stable home, and failure to comply with a family plan of service in its best-interest determination. *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.).

Stability and permanence are paramount in the upbringing of children. *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in a child's best interest. *In re D.M.*, 452 S.W.3d 462, 472

(Tex. App.—San Antonio 2014, no pet.). The factfinder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *In re J.D.*, 436 S.W.3d at 119–20. The evidence at trial indicated that Mother had a history of instability in housing and employment. During the pendency of the case, Mother resided in three different residences. Her most recent move was to Greenville with Kenneth. She acknowledged that the children would have to change schools, and it would be another adjustment for them. She has not explored what activities would be available for the children. She failed to articulate any detailed plan for addressing the children's emotional or physical needs except for ongoing counseling. Conversely, the foster family knows the children well. They have been providing a drug-free environment for the past twenty-one months, and the stability, structure, security, and consistency that the children need. The children are strongly bonded with the foster family and are doing well in the home. The children enjoy school and have made friendships. The foster family plans to adopt H.M.L. and D.J.C. The Department's plan for the children's adoption provides permanence and stability for the children.

While the trial court heard evidence contrary to the finding that termination of Mother's parental rights was in the children's best interest, including evidence that Mother's bond and relationship with the children were improving during therapeutic sessions, the overwhelming evidence in the record supports the trial court's finding. We acknowledge Mother's testimony that she was drug free and addressing her mental health issues at the time of trial. The factfinder may determine that a parent's changes shortly before trial, however, are too late to have an impact on the best-interest determination.

20

*In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied) ("evidence of a recent improvement does not absolve a parent of a history of irresponsible choices").

Applying the applicable *Holley* factors to the evidence, and giving proper deference to the trial court's determinations of witness credibility and the weight to be given to the evidence, we conclude the evidence is legally and factually sufficient to establish a firm conviction in the mind of the trial court that termination of Mother's parental rights is in the best interest of H.M.L. and D.J.C. *See In re S.B.*, 207 S.W.3d at 887–88 (parent's drug use, inability to provide stable home, and failure to comply with service plan supported best-interest finding). We overrule Mother's fifth issue challenging the best-interest determination.

## CONCLUSION

Having overruled the issues raised by Mother's appeal, we affirm the judgment of the trial court terminating Mother's parental rights.

Judy C. Parker
Justice

21